UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| FRANK MARTINEZ GARCIA, | § | |
| TDCJ No. 999418, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL NO. SA-08-CA-62-XR |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER DENYING RELIEF**

Petitioner Frank Martinez Garcia filed this federal habeas corpus action pursuant to 28 U.S.C. Section 2254 challenging his February 2002, Bexar County capital murder conviction and death sentence. For the reasons set forth hereinafter, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

## I. Statement of the Case

A. Factual Background

On the morning of March 29, 2001, petitioner fatally shot uniformed San Antonio Police Officer Hector Garza and petitioner's wife Jessica inside the home petitioner shared with Jessica, their children, and petitioner's parents.[1] There is no genuine dispute

---

[1] The autopsy of Officer Garza revealed (1) he died as a result of four gun shot wounds, each of which would have been fatal alone, (2) the four shots struck Garza, respectively, in the head, two in the back of the neck, and one in the abdomen, which

about that fact.  After subsequently firing several shots at others outside the Garcia residence, wounding one person, and causing damage to a nearby elementary school, petitioner surrendered to police and gave a formal, written statement in which he admitted to intentionally killing both officer Garza and Jessica.[2]

_____

penetrated the lungs and aorta, (3) the shot through Garza's chest was likely the first to strike him, (4) the shots to Garza's chest and head came from a non-high-velocity weapon, and (5) the two shots which struck Garza in the neck came from a high velocity weapon, exited through the skull, and caused massive damage to the brain and cranial vault. Statement of Facts from petitioner's trial, Volume 18, testimony of Dr. Robert C. Bux, at pp. 70-95.

The autopsy performed on the body of Jessica Garcia revealed (1) she died as a result of three gunshot wounds, only one of which would have been fatal alone, (2) the fatal gunshot struck Jessica in the left forehead, fractured her orbital area, and penetrated through the midbrain, (3) the two, non-fatal shots struck her in the right cheek and her chin, (4) all the gunshots which struck Jessica came from a non-high-velocity weapon, and (5) the latter two gunshot wounds likely struck Jessica while she was down on the floor. *Id.*, at pp. 95-111.

[2] Several witnesses testified to having personally witnessed petitioner firing two different weapons at persons located outside the Garcia residence on the morning of the fatal shootings.

A friend of Jessica testified (1) an emotional Jessica called her on the morning of the fatal shootings and asked her to help Jessica move out, (2) after securing assistance from John and Rosario Luna, she rode with the Lunas to Jessica's residence, (3) petitioner's mother interfered with their efforts to help Jessica remove clothing and other personal items from the Garcia residence, (4) she overheard Jessica telling petitioner over the phone that Jessica was leaving him, (5) petitioner arrived at the Garcia home before the police and petitioner grabbed Jessica in a head lock and dragged her back inside the Garcia home, (6) moments later a police officer walked inside the Garcia home, (7) a few minutes after the officer entered the house, she heard three-to-four shots in rapid succession come from inside the house, (8) after a pause, she heard a second series of approximately three shots come from inside the house, (9) petitioner then emerged from the house, pointed a firearm, and fired several shots, at least a few of which struck their vehicle, (10) petitioner fired at her and John Luna as they

attempted to flee the scene toward a nearby elementary school, (11) petitioner went back inside the house and she heard several more shots, (12) petitioner emerged from the house a second time holding a big rifle and fired that weapon, striking the truck behind which she was hiding, i.e., the same truck petitioner had driven to the scene, and (13) she saw petitioner chasing after John Luna as she fled for the safety of the school. S.F. Trial, Volume 17, testimony of Sylvia Duran, at pp. 69-113.

John Luna testified (1) he and his wife assisted Jessica in carrying bags of clothing out of the Garcia residence to the trunk of his car, (2) petitioner arrived at the scene before the police, stopped his truck in the middle of the street, leaped from the truck, and grabbed Jessica by the neck, (3) petitioner dragged Jessica back inside the house, (4) he flagged down an approaching police vehicle, (5) the police officer went inside the Garcia residence, (6) he heard shots coming from inside the house shortly thereafter, (7) he directed his wife to call the police and inform them shots had been fired, (8) petitioner emerged from the Garcia residence firing what appeared to be an Uzi-like weapon, (9) he went to his car where he had a handgun while petitioner went back inside, (10) when petitioner next emerged from the Garcia residence, petitioner fired at Luna, who was attempting to hide behind the Bill Miller truck petitioner had abandoned in the middle of the street, (11) petitioner fired at Luna, striking Luna once in the leg, and (12) Luna was allowed to enter the school, where he later received medical care from EMS personnel for his leg wound, which required Luna to spend a day and a half in the hospital. S.F. Trial, Volume 20, testimony of John Luna, at pp. 10-38.

The then-vice-principal of the nearby Emma Frey Elementary School testified (1) she noticed a police vehicle in front of the Garcia residence when she arrived at school around 7:30 that morning, (2) she later noticed the police vehicle was gone when she saw Jessica outside the Garcia residence between 8:45 and 8:50, (3) around nine a.m. she was alerted to a problem by other staff, (4) as she exited the campus building near the Garcia residence, she saw a man later identified for her as John Luna running toward her who was yelling "Get out of here. He's shooting at everyone," (5) she looked toward the Garcia residence and saw a man in the yard holding a rifle, who then pointed it at her or in her direction, (6) as she and Luna attempted to flee away from the Garcia residence, she heard four shots, (7) the school custodian let her and Luna inside the school, (8) once inside the school, she climbed to the second floor, ordered the school locked down, telephoned school district police, and looked out and saw petitioner with the rifle in the front yard of the Garcia residence walking away from

B.  <u>Indictment</u>

On September 18, 2001, a Bexar County grand jury indicted petitioner in cause no. 2001-CR-4925 on a single count of capital murder, to wit, intentionally and knowingly causing the death of Hector Garza by fatally shooting Garza with a firearm while Garza was acting in the discharge of his official duty as a police officer.[3]

---

the school, and (9) subsequent examination of the school's exterior disclosed several indentations in the front doors, as well as a hole in a window screen that had not been present before the shootings. S.F. Trial, Volume 22, testimony of Joyce St. John, at pp. 46-61.

The San Antonio Police Officer who arrested petitioner testified (1) he knocked repeatedly and announced himself before entering the Garcia residence, (2) he heard a box of bullets hit the floor and footsteps running his direction, (3) he heard a rifle racking and smelled gunpowder and blood, (4) petitioner came out and pointed an assault rifle at him, (5) when petitioner saw the officer's weapon, petitioner retreated, shouted "I give up," and threw down his rifle, and (6) petitioner thereafter offered no resistance. S.F. Trial, Volume 19, testimony of Robert Carter, at pp. 97-111.

In his five-page, formal, written statement executed only hours after the fatal shootings, admitted into evidence as State Exhibit no. 115, which appears at S.F. Trial, Volume 26, petitioner admits he deliberately fired at officer Garza's head multiple times and then turned his weapon on his wife.  The petitioner's written statement was also read into the record verbatim in open court and appears at S.F. Trial, 20, at pp. 191-201.

[3] Copies of the indictment against petitioner appear at various places in the state court records relating to petitioner's trial, appeal, and state habeas corpus proceeding. *See, e.g.,* Trial Transcript, Volume I of II, at p. 6; State Habeas Corpus Transcript, at pp. 117, 119.

C.    <u>Guilt-Innocence Phase of Trial</u>

The guilt-innocence phase of petitioner's capital murder trial commenced on February 4, 2002.[4]  In addition to the testimony summarized above, petitioner's jury also heard testimony from forensic and firearms experts regarding (1) the MAC-10 semi-automatic weapon and the Egyptian-made AK-47 assault rifle petitioner used to shoot Officer Garza and Jessica, (2) ballistics evidence about the shell casings and bullet fragments found at the crime scene, and (3) testimony regarding the blood, blood spatter, and other trace evidence recovered from the crime scene and petitioner's clothing.  The foregoing testimony corroborated those portions of petitioner's written statement in which he admitted to having emptied both the semi-automatic pistol and assault rifle following his fatal shooting of Officer Garza and Jessica.  The defense presented no witnesses or other evidence during the guilt-innocence phase of petitioner's capital murder trial.  On February 8, 2002, after deliberating less than three hours, petitioner's jury returned a verdict of guilty.[5]

---

[4] At trial, petitioner was represented by attorneys Michael C. Gross and Joseph A. Esparza.  The prosecutors were Bexar County Criminal District Attorney Susan Reed, and assistant District Attorneys James Blagg and Christopher DeMartino.

[5] Trial Transcript, Volume II of II, at pp. 277-86, 288; S.F. Trial, Volume 21, at pp. 37-39; State Habeas Transcript, at pp. 124-33, 135.

D.  Punishment Phase of Trial

     The  punishment  phase  of  petitioner's  capital  murder  trial
commenced on the afternoon of February 8, 2002.

     The prosecution presented evidence that showed (1) while being
transported  to  booking  on  the  afternoon  following  the  fatal
shootings,  petitioner  responded  to  a  reporter's  question  with  a
vitriolic epithet,[6] (2) police  found  inside  the  Garcia  residence
photographs of petitioner and Jessica each brandishing weapons,[7]
(3)  when  arrested  with  other  gang  members  in  1992,  petitioner
identified himself as a member of the "Angels of Sin" street gang,
an  organization  believed  by  police  to  have  engaged  in  drive-by
shootings, drug-dealing, aggravated assaults, and other felonies,[8]
(4) during his rampage, petitioner pointed and fired his weapon at
the vice-principal of the nearby elementary school, striking the
front door of the school,[9] (5) on one occasion in December 1994,
Jessica  Garcia  sought  the  protection  of  the  Battered  Women's
Shelter  after  she  claimed  petitioner  physically  assaulted  and

---

        [6] S.F. Trial, Volume 22, testimony of Ben Esquivel, at pp. 5-
6.

        [7] S.F. Trial, Volume 22, testimony of Thomas Matjeka, at pp.
14-17.

        [8] S.F. Trial, Volume 22, testimony of John Schiller, at pp.
32-37, 41.

        [9] S.F. Trial, Volume 22, testimony of Joyce St. John, at pp.
46-61.

emotionally abused her,[10] (6) petitioner once threatened to shoot a teenage neighbor who petitioner believed had fired at petitioner's vehicle,[11] (7) one of Jessica's co-workers saw marks and bruises on Jessica on several occasions and Jessica once told her petitioner forcibly cut Jessica's hair,[12] and (8) Officer Garza's death had left a painful void in his family.[13]

The defense presented witnesses who testified (1) petitioner had not engaged in any violent conduct while detained awaiting trial,[14] (2) petitioner was considered a "very nice, responsible," and "very loving person" by his former supervisor, who also described petitioner as "somebody that could get the job done when asked,"[15] and (3) petitioner's priest never saw any bruises on

---

[10] S.F. Trial, Volume 22, testimony of Joyce Coleman, at pp. 78-85.

[11] S.F. Trial, Volume 23, testimony of Martin Galiano III, at pp. 3-10.

[12] S.F. Trial, Volume 23, testimony of Gloria Mireles, at pp. 25-28.

[13] S.F. Trial, Volume 23, testimony of Gilda Garza, at pp. 30-36.

[14] S.F. Trial, Volume 23, testimony of Patrick Skillman, at pp. 37-41.

[15] S.F. Trial, Volume 23, testimony of Delores Ortiz, at pp. 41-50.

Jessica or anything that led him to believe Jessica was afraid of petitioner.[16]

On February 11, 2002, after deliberating approximately four hours, petitioner's jury returned its verdict, finding (1) there was a reasonable probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense, the petitioner's character and background, and the petitioner's moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment, rather than a death sentence.[17]  Based on the jury's verdict, the state trial court imposed a sentence of death.[18]

E.    Direct Appeal

On December 2, 2002, petitioner filed his appellant's brief, urging seven points of error.[19]  In an opinion issued January 21,

_____

[16] S.F. Trial, Volume 23, testimony of Dennis Darilek, at pp. 52-56.

[17] Trial Transcript, Volume II, at pp. 303-05; S.F. Trial, Volume 23, at pp. 81-83; State Habeas Transcript, at pp. 49-51.

[18] S.F. Trial, Volume 23, at p. 85.

[19] As points of error on direct appeal, petitioner argued (1) the trial court erred in overruling defense counsel's objection to the prosecution's opening statements commenting on petitioner's post-arrest silence and failure to testify, (2) the trial court erred when it failed to instruct the jury to disregard the prosecution's attack upon the personal morals and trustworthiness of defense counsel, (3) the trial court erred when it admitted hearsay-within-hearsay consisting of business records from the Bexar County Battered Women's Shelter during the punishment phase

2004, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence. *Garcia v. State*, 126 S.W.3d 921 (Tex. Crim. App. 2004). Petitioner did not thereafter seek further review of his conviction or sentence from the United States Supreme Court via certiorari.

F.  State Habeas Corpus Proceeding

On September 22, 2003, petitioner filed his state habeas corpus application, asserting therein various for relief.[20]

---

of petitioner's trial, (4) the trial court erred when it admitted testimony regarding petitioner's 1992 gang affiliation during the punishment phase of petitioner's trial, (5) the trial court erred when it admitted "victim impact" evidence in the form of John Luna's medical records, and (6) the Texas death penalty scheme violates the Eighth Amendment. Petitioner's state appellate counsel was attorney Vincent D. Callahan.

[20] As claims for relief in his state habeas corpus application, petitioner argued (1) the trial court erred in failing to adequately instruct petitioner's jury at the punishment phase of trial, (2) more specifically, the trial court failed to define various cryptic terms employed in the Texas capital sentencing special issues, (3) Texas Code of Criminal Procedures articles 44.251(a) and 37.071, §2(e) are facially unconstitutional because they fail to assign a burden of proof beyond a reasonable doubt to the mitigation special issue, (4) the Texas capital sentencing scheme fails to provide for proportionality review, (5) the Texas statutory definition of "mitigating evidence" is unconstitutionally narrow, (6) the Texas capital sentencing scheme's mitigation special issue is facially unconstitutional because it fails to place the burden of proof on the prosecution and grants the jury open-ended discretion whether to withhold the death penalty, (7) the Texas capital sentencing scheme violates both the Texas and United States Constitutions, (8) the Texas twelve/ten rule found in art. 37.071 of the Texas Code of Criminal Procedure fails to inform the jury regarding the impact of a single holdout juror, (9) petitioner's trial counsel rendered ineffective assistance by failing to (a) adequately investigate, develop, and present unidentified mitigating evidence, (b) object to the prosecutor's statement during voir dire that she had once been a judge, (c)

On October 24, 2005, the state habeas trial court held an evidentiary hearing and heard testimony from petitioner's mother, sister, cousin, niece, and former lead trial counsel.

In an Order issued February 15, 2007, the state habeas trial court issued its findings of fact, conclusions of law, and recommendation that petitioner's sate habeas corpus application be denied.[21]

On June 20, 2007, the Texas Court of Criminal Appeals issued an unpublished Order in which it adopted the trial court's findings and conclusions and denied petitioner's state habeas corpus application. *Ex parte Frank M. Garcia,* 2007 WL 1783194 (Tex. Crim. App. June 20, 2007).

G.    Proceedings in this Court

On June 11, 2008, petitioner filed his original federal habeas corpus petition. *Docket entry no. 8.*

On October 14, 2008, petitioner filed his first amended federal habeas corpus petition. *Docket entry no. 11.*

---

object to the admission of the 911 tapes and transcripts, (d) request limiting instructions regarding petitioner's gunfire after shooting the two victims, (e) request a change of venue, (f) develop facts to support a sudden passion defense, (f) request a "sudden passion" instruction at the punishment phase of trial, and (g) investigate, develop, and present evidence showing petitioner is mentally retarded, (10) petitioner's due process rights were violated by the admission of the 911 tape recordings and transcripts, and (11) the prosecution improperly commented on petitioner's failure to testify. Petitioner's state habeas counsel was attorney Richard Langlois.

[21] State Habeas Transcript, at pp. 213-26.

On January 29, 2009, respondent filed his original answer to petitioner's first amended petition. *Docket entry no. 16.*

On March 16, 2009, petitioner filed his reply to respondent's original answer. *Docket entry no. 18.*

On November 9, 2009, petitioner filed his second amended federal habeas corpus petition. *Docket entry no. 31.*

## II. <u>AEDPA Standard of Review</u>

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S. Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S. Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S. Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S. Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct

governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125 S. Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S. Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S. Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S. Ct. at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S. Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision

establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S. Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S. Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S. Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or

abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S. Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006)(holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006)(holding the same), *cert. denied*, 550 U.S. 920 (2007); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)(holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003)(holding a federal habeas

court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002)(*en banc*)(holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. *Atkins* Claim

A.    The Claim

Petitioner argues in his seventh claim herein that he is mentally retarded and, thereby, exempt from the death penalty pursuant to the Supreme Court's holding in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L.Ed.2d 335 (2002), which held the Eighth Amendment precludes the execution of mentally retarded capital murderers. *Petitioner's Second Amended Application [sic] for Writ of habeas Corpus, filed November 9 2009, docket entry no. 31, (henceforth "Second Amended Petition"), at pp. 129-91.*

B.    State Court Disposition

Petitioner "fairly presented" this same Eighth Amendment claim to the state court as claim twenty-one contained in his state habeas corpus application.[22]  While respondent correctly points out this particular claim was *titled* in petitioner's state habeas pleading in a manner suggesting petitioner was arguing exclusively

---

[22] State Habeas Transcript, at pp. 58-75.

that his trial counsel rendered ineffective assistance in violation of the Sixth Amendment, even a cursory review of the actual argument and authorities cited by petitioner in support of his claim make evident petitioner was also attempting to argue, albeit somewhat inarticulately and ambiguously, he is, in fact, mentally retarded within the standard alluded to by the Supreme Court in *Atkins*. Thus, petitioner "fairly presented" his state habeas court with his Eighth Amendment claim that he is mentally retarded.

During the evidentiary hearing held October 24, 2005, in petitioner's state habeas corpus proceeding, however, petitioner presented the state habeas court with virtually no evidence suggesting petitioner was, in fact, mentally retarded. Petitioner's state habeas counsel introduced no school, medical, or other mental health records establishing petitioner had ever been diagnosed as mentally retarded. Petitioner's state habeas counsel presented the state habeas court with no documents showing petitioner had ever exhibited significantly subaverage intellectual capabilities, in school or otherwise. Nor did petitioner present any evidence suggesting petitioner ever suffered from any significant deficiencies in adaptive behavior prior to age eighteen. Petitioner's mother Eustacia Garcia, petitioner's sister Letitia Martinez, petitioner's cousin Lucy Lopez, and petitioner's niece all testified regarding petitioner's childhood. None

testified to any facts which established petitioner was mentally retarded.

Petitioner's mother testified petitioner (1) flunked the first and ninth grades, (2) was twenty-two years old when he finally dropped out of high school in the twelfth grade, (3) wore braces on his legs from an early age until just before he began school, (4) fell a lot when he was a small child, (5) watched a lot of television and spent a lot of time alone when he was a child, (6) had artistic talent, (7) was never in Special Education classes, (8) was never diagnosed as mentally retarded to her knowledge, and (9) was never treated by a physician for any head injuries.[23]

Petitioner's sister Letitia Martinez testified petitioner (1) was the youngest of five children, (2) had problems with his legs when he was little which required him to wear leg braces and, as a result, he fell a lot, (3) had difficulties in school, (4) was in Special Education classes, (5) was not bright, (6) flunked at least one grade but reached twelfth grade, (7) lived with their parents even after he and Jessica married, (8) chose to live at home so he could help their parents pay their bills, (9) never received any medical attention for any head injury as a child, and (10) was able

---

[23] Statement of Facts from State Habeas Corpus Evidentiary Hearing, held October 24, 2005 (henceforth "S.F. State Habeas Hearing"), testimony of Eustacia Martinez Garcia, at pp. 5-12.

18

to hold jobs and to obtain a driver's license.[24]  She also testified she spoke about these same subjects with petitioner's trial counsel prior to petitioner's trial.[25]

Petitioner's cousin Lucy Lopez testified (1) she had known petitioner her whole life, (2) she grew up with petitioner, (3) while petitioner had no difficulties in school of which she was aware, petitioner was a "slow" student who stuttered as a child, (4) petitioner was always drawing cars and cartoons, (5) she baby-sat for petitioner, who was able to feed himself, (6) petitioner's family spoke Spanish in the home and neither of his parents spoke much English, (7) she never felt afraid of petitioner, (8) to her knowledge, petitioner was never diagnosed as retarded, and (9) petitioner was saving up to get his own apartment or home and making car payments while he and Jessica lived with petitioner's parents.[26]

Petitioner's niece Rosemary Avila testified (1) she was one year younger than petitioner and spent many weekends with petitioner while they were growing up, (2) she worked with Jessica

---

[24] S.F. State Habeas Hearing, testimony of Letitia Martinez, at pp. 51-62.

[25] *Id.*, at p. 61.

[26] S.F. State Habeas Hearing, testimony of Lucy Lopez, at pp. 66-76.

at Moll Industries, and (3) Jessica told her petitioner treated her badly and once beat her.[27]

Petitioner's former lead trial counsel, attorney Michael C. Gross, testified (1) the defense team's initial plan was to present a psychological defense but, after the defense's forensic psychologist examined petitioner, that option "did not pan out," (2) the defense's forensic psychologist concluded petitioner's IQ was "normal," (3) he had worked with the defense's mental health expert, Dr. Jack Ferrell, previously and had every confidence in Dr. Ferrell's opinion, (4) Dr. Ferrell concluded petitioner's IQ was not something the defense could employ in mitigation at the punishment phase of trial, (5) he reviewed petitioner's school and employment records and was unable to develop any evidence to support a finding of mental retardation or an insanity defense, (6) the defense team interviewed between fifty and sixty persons who knew petitioner but were unable to find anyone who could testify that petitioner displayed deficits in adaptive behavior while growing up, (7) none of petitioner's family members offered anything of a mitigating nature regarding petitioner's childhood, (8) he had no difficulty communicating with petitioner or getting information from petitioner, who communicated "extremely well," (9) petitioner's whole family told him petitioner had no problems in

---

[27] S.F. State Habeas Hearing, testimony of Rosemary Avila, at pp. 77-90.

school, (10) none of petitioner's family ever told him petitioner had been in Special Education classes, (11) petitioner's family described petitioner's childhood as normal, (12) Dr. Ferrell expressed opinions regarding petitioner that were double-edged in nature, such as his opinions that petitioner was remorseless, cold-blooded, and possessed an antisocial personality, (13) some members of petitioner's family had given interviews with the news media after the shootings in which they described their own fear of petitioner, (14) he never found any evidence suggesting petitioner suffered an abused or neglected childhood, and (15) there was no evidence petitioner was unable to perform his job.[28]

Significantly, petitioner's state habeas counsel presented no testimony from any mental health professional, educator, or other expert suggesting petitioner was, in fact, mentally retarded.

The state habeas trial court concluded (1) petitioner's trial counsel conducted a meaningful mitigation investigation but found no evidence suggesting petitioner is mentally retarded, (2) the defense team's mental health expert, Dr. Ferrell, tested petitioner and found petitioner to be in the normal range for intelligence, (3) the defense team was unable to locate any witnesses who could testify petitioner suffered from deficits in adaptive behavior, (4) the defense team feared Dr. Ferrell's opinion that petitioner

---

[28] S.F. State Habeas Hearing, testimony of Michael C. Gross, at pp. 21-50.

lacked remorse would undermine their mitigation strategy, (5) none of petitioner's family members offered the defense team any mitigating evidence regarding petitioner's upbringing or childhood, (6) several members of petitioner's family gave interviews in which they indicated they were afraid of petitioner, (7) *there was no evidence available to petitioner's trial counsel at the time of trial indicating petitioner was mentally retarded*, and (8) *petitioner failed to present the state habeas trial court with any evidence establishing he is, in fact, mentally retarded*.[29]

The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it denied petitioner's state habeas corpus application. *Ex parte Frank M. Garcia,* 2007 WL 1783194 (Tex. Crim. App. June 20, 2007).

C.  Analysis

There are several analytical impediments to this Court's application of the AEDPA's standard of review to petitioner's *Atkins* claim.  Chief among them is the fact the Supreme Court's *Atkins* opinion did not specify a *legal* definition of "mental retardation" but, rather, referred to a pair of *clinical* definitions of mental retardation which leave the determination open to some interpretation.

For purposes of this federal habeas corpus proceeding, the issue before this Court is whether the state habeas court's

_____

[29] State Habeas Transcript, at pp. 220-22.

rejection on the merits of petitioner's *Atkins* claim was either (1) contrary to, or involved an unreasonable application of, clearly established federal law, *as determined by the Supreme Court of the United States*, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. *Williams v. Taylor*, 529 U.S. at 404-05, 120 S. Ct. at 1519; 28 U.S.C. § 2254(d). Implicit in the first half of AEDPA analysis is the assumption that *clearly established* federal law exists defining the parameters of a federal constitutional right. In the post-*Atkins* realm of mental retardation, the existence of a constitutional right is clear but its parameters are more difficult to discern.

The Supreme Court's Eighth Amendment analysis in *Atkins* focused initially on current trends among state legislatures regarding the imposition of the death sentence on mentally retarded capital murderers. *See Atkins v. Virginia*, 536 U.S. at 311-17, 122 S. Ct. at 2246-50 (holding that the Eighth Amendment draws its meaning from the evolving standards of decency that mark the progress of a maturing society and that the clearest and most reliable objective evidence of contemporary values is the legislation enacted by state legislatures). The Supreme Court then shifted its focus to the dual penological purposes served by the death penalty: retribution and deterrence of capital crimes by

prospective offenders. *Id.*, 536 U.S. at 318-21, 122 S. Ct. at 2250-52. With regard to retribution, the Court held an exclusion from the death penalty for mentally retarded capital murderers was warranted by virtue of "the lesser culpability of the mentally retarded offender" when compared to "the culpability of the average murderer." *Id.*, 536, U.S. at 319, 122 S. Ct. at 2251. The Court next addressed the remaining penological purpose served by capital sentencing:

> With respect to deterrence -- the interest in preventing capital crimes by prospective offenders -- "it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation.'" Exempting the mentally retarded from that punishment will not affect the "cold calculus that precedes the decision" of other potential murderers. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders. The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable--for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses--that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.

*Atkins*, 536 U.S. at 319-20, 122 S. Ct. at 2251 (citations omitted). The Supreme Court ultimately concluded that execution of mentally retarded criminals would not measurably advance the deterrent or retributive purposes underlying the death penalty and, therefore,

24

the Eighth Amendment prohibits such punishment. *Atkins*, 536 U.S. at 321, 122 S. Ct. at 2252.

However, the Supreme Court declined in *Atkins* to furnish state and lower federal courts with a definitive *legal* definition of "mental retardation" or "mentally retarded," instead offering two *clinical* definitions as possible options:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."
> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."[30]

Like most clinical definitions drawn from the medical and biological sciences, the foregoing definitions cited, but not specifically adopted, by the Supreme Court do not transfer easily

---

[30] *Atkins v. Virginia*, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3 (citations omitted).

into the realm of law, where legally valid distinctions and classifications must necessarily be based on more than a subjective choice between the conflicting testimony of differing diagnosticians.[31]

The lack of a clear definition of "mental retardation" approved by the Supreme Court does not complicate the resolution of this case, however, because, as the state habeas court astutely pointed out, petitioner utterly failed to present the state habeas court with any evidence suggesting petitioner either (1) currently exhibits significantly sub-average intellectual functioning or (2) displayed significant limitations in adaptive functioning in any skill area prior to age eighteen. Under the AEDPA, the focus of this Court's review of the state habeas court's rejection of petitioner's *Atkins* claim on the merits lies with the reasonableness of that determination in view of clearly established federal law and the evidence presented to the state habeas court. 28 U.S.C. §2254(d). This federal habeas proceeding is not a proper forum for re-litigating the issue of petitioner's mental retardation *de novo* when petitioner was afforded a full and fair

---

[31] The Supreme Court and Texas Court of Criminal Appeals have each noted the lack of confluence between psychiatric definitions and legal ones. *See Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 871, 151 L.Ed.2d 856 (2002)("the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law."), *quoted in Ex parte Briseno*, 135 S.W.3d 1, 9 n.30 (Tex. Crim. App. 2004).

opportunity to litigate that same claim in the course of his state habeas corpus proceeding and did, in fact, fully litigate his *Atkins* claim in that state forum.

The Supreme Court's opinion in *Atkins* urged state courts to apply one or either of the two clinical definitions of mental retardation discussed above, both of which required a showing of significantly sub-average intellectual functioning combined with a showing of significant deficits in adaptive behavior demonstrated prior to age eighteen. The state habeas court reasonably concluded that petitioner's state habeas counsel failed to present the state habeas court with any evidence showing petitioner satisfied either of these two criteria.

Moreover, the state habeas court also had before it the trial testimony of petitioner's former supervisor, who described petitioner as "very reliable," "honest," and "somebody that could get the job done when asked."[32] Finally, there was also evidence before the state habeas court establishing petitioner had (1) obtained a driver's license, (2) been employed in several different jobs during his adult life, (3) reached grade twelve, (4) been married for several years, and (5) fathered two children. Petitioner presented the state habeas court with no evidence showing petitioner had ever been terminated from any employment

---

[32] S.F. Trial, Volume 23, testimony of Delores Ortiz, at pp. 41-42.

position for incompetence or that petitioner had ever displayed any difficulty communicating in English that might be unusual for a person raised in a Spanish-speaking household. In the absence of any evidence showing petitioner had ever been diagnosed by any mental health or education professional as mentally retarded, there was absolutely nothing unreasonable about the state habeas court's implicit conclusion petitioner was not mentally retarded.

D. <u>Conclusions</u>

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Atkins* claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding. Petitioner's seventh claim herein does not warrant federal habeas relief under the AEDPA.

**IV. <u>Constitutionality of the Texas Capital Sentencing Scheme</u>**

A. <u>The Claim</u>

Petitioner argues in his sixth claim herein that the Texas capital sentencing scheme violates the Eighth Amendment because the Texas capital sentencing special issues (1) employ a number of "undefined terms," (2) fail to adequately channel the capital sentencing jury's discretion, and (3) thereby are contrary to the principles the Supreme Court announced in *Ring v. Arizona*, 536 U.S.

584, 122 S. Ct. 2428, 153 L.Ed.2d 556 (2002). *Second Amended Petition, at pp. 112-28.*

B.   State Court Disposition

The state habeas court rejected these same arguments for two reasons: first, the Texas Court of Criminal Appeals had repeatedly rejected these same arguments; and, second, these claims could and should have been raised on direct appeal and, therefore, were not properly presented in a Texas habeas corpus proceeding.[33]

C.   Procedural Default

Petitioner procedurally defaulted on his claims attacking the facial constitutionality of the Texas capital sentencing scheme by failing to present those same arguments in his direct appeal. While petitioner did include a generic attack upon the death penalty as his seventh and final point of error in his appellant's brief, petitioner did not attack the Texas capital sentencing scheme's special issues in the same manner he challenges them in this federal habeas corpus proceeding until he filed his state habeas corpus application. *See Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007)(recognizing the Texas Court of Criminal Appeals' rule in *Ex parte Gardner*, which bars state habeas review of claims which should have been raised on direct appeal, sets forth an adequate state ground capable of barring federal habeas review), *cert. denied*, ___ U.S. ___, 128 S. Ct. 1444, 170 L.Ed.2d

---

[33] State Habeas Transcript, at pp. 214-16.

277 (2008); *Brewer v. Quarterman*, 466 F.3d 344, 347 (5th Cir. 2006)(holding state court's finding that petitioner should have, but failed, to raise a claim on direct appeal foreclosed state habeas review and constituted a procedural barrier to federal habeas review of the same claim), *cert. denied* ___ U.S. ___, 128 S. Ct. 63, 169 L.Ed.2d 52 (2007). Moreover, those arguments possess no arguable merit.

D.    AEDPA Review

     1.    Clearly Established Federal Law

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent. *Apprendi*, 530 U.S. at 497, 120 S. Ct. at 2366. The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens' and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U.S. 227, 252-53, 119 S. Ct. 1215, 1228-29, 143 L.Ed.2d 311 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved

beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63.  Put more simply, the Supreme Court held (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2363.

Two years later, in *Ring v. Arizona*, *supra*, the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of pre-meditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (i.e., the fatal shooting of an armored van guard during a robbery) and (2) the foregoing aggravating factor out-weighed the lone mitigating factor favoring a life sentence (i.e., the defendant's minimal criminal record).[34]

---

[34] In point of fact, the Arizona trial judge found a second aggravating factor applied in Ring's case, i.e., Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's marksmanship rendered his offense "especially heinous, cruel, or depraved."  The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless re-weighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona*, 536 U.S. at

*Ring*, 536 U.S. at 609, 122 S. Ct. at 2443.  The Supreme Court emphasized, as it had in *Apprendi*, the dispositive question "is not one of form, but of effect": [i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S. Ct. at 2439.  "A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ring*, 536 U.S. at 602, 122 S. Ct. at 2439-40, *quoting Apprendi*, 530 U.S. at 483, 120 S. Ct. at 2359.  Because Ring would not have been subject to the death penalty but for the trial judge's factual determination as to the existence of an aggravating factor, the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Ring*, 536 U.S. at 609, 122 S. Ct. at 2443.

2.  <u>Punishment Phase of Petitioner's Trial</u>

At the punishment phase of petitioner's capital trial, the jury was faced with two special issues: the first inquired whether the prosecution had established beyond a reasonable doubt that a probability existed the petitioner would commit criminal acts of violence constituting a continuing threat to society; and the second inquired whether, without any express or implicit burden of proof assigned, the mitigating evidence warranted a sentence of

_____

595-96, 122 S. Ct. at 2435-36.

less than death.[35]  This submission was consistent with Section 2 of Article 37.071 of the Texas Code of Criminal Procedure, which mandates the state carry the burden of proving the defendant's future dangerousness "beyond a reasonable doubt," but imposes no similar burden of proof requirement for the *Penry* or mitigation special issue.

    3.  <u>Synthesis</u>

Petitioner's arguments in support of this claim equate his jury's negative answer to the *Penry* or mitigation special issue included in the Texas capital sentencing scheme with the Arizona trial judge's factual findings regarding the existence of aggravated factors in *Ring*.  However, petitioner misperceives the true nature of the Texas capital sentencing scheme.

The Supreme Court explained in *Tuilaepa v. California*, 512 U.S. 967, 114 S. Ct. 2630, 129 L.Ed.2d 750 (1994), that the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa*, 512 U.S. at 971, 114 S. Ct. at 2634.  The Supreme Court's analysis of those two aspects of capital sentencing provides a comprehensive system for analyzing Eighth Amendment claims:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment.  To render a defendant eligible for the death penalty in a homicide case, we

---

[35] Trial Transcript, Volume II of II, at pp. 294-305; State Habeas Transcript, at pp. 100-12.

have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.   *  *  *

We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971-73, 114 S. Ct. at 2634-35 (citations omitted).

The Supreme Court clearly pronounced in *Tuilaepa* that states may adopt capital sentencing procedures that rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa*, 512 U.S. at 974, 114 S. Ct. at 2636. The Supreme Court held further that, at the *selection* stage, states are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S. Ct. at 2638.

In *Loving v. United States*, 517 U.S. 748, 116 S. Ct. 1737, 135 L.Ed.2d 36 (1996), the Supreme Court discussed the first part of the *Tuilaepa* analysis, i.e., the eligibility decision, as follows:

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U.S. at 755, 116 S. Ct. at 1742 (citations omitted).[36]

The Arizona capital sentencing scheme the Supreme Court addressed in *Ring* relied upon a trial judge's factual findings of "aggravating" factors and directed the trial judge to weigh those aggravating factors against any mitigating factors found to apply to the defendant. Thus the Arizona trial judge's factual findings in *Ring* were part of the constitutionally-mandated eligibility determination, *i.e.*, the narrowing function.

In contrast, the Texas capital sentencing scheme under which petitioner was tried, convicted, and sentenced performed the constitutionally-required narrowing function discussed in *Tuilaepa*

---

[36] The Supreme Court subsequently elaborated on the distinction between the narrowing function or eligibility decision and the selection phase of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269, 275-77, 118 S. Ct. 757, 761-62, 139 L.Ed.2d 702 (1998).

and *Loving* at the guilt-innocence phase of petitioner's trial and further narrowed the category of those eligible for the death penalty by requiring a finding, beyond a reasonable doubt, of future dangerousness. *See Sonnier v. Quarterman*, 476 F.3d 349, 365-67 (5th Cir. 2007)(recognizing the Texas capital sentencing scheme, like the one upheld by the Supreme Court in *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L.Ed.2d 429 (2006), performs the constitutionally required narrowing function through its statutory definition of capital murder and further narrows the category of those eligible for the death penalty by requiring an additional fact finding, beyond a reasonable doubt, that there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society), *cert. denied,* ___ U.S. ___, 128 S. Ct. 374, 169 L.Ed.2d 259 (2007).

Unlike Arizona's weighing scheme, the Texas capital sentencing scheme performs the constitutionally mandated narrowing function, i.e., the process of making the "eligibility decision," at the guilt-innocence phase of a capital trial by virtue of the manner with which Texas defines the offense of capital murder in Section 19.03 of the Texas Penal Code. *See Johnson v. Texas*, 509 U.S. 350, 362-66, 113 S. Ct. 2658, 2666-68, 125 L.Ed.2d 290 (1993)(Texas capital sentencing scheme was not constitutionally deficient in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different

classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. 231, 243-47, 108 S. Ct. 546, 554-55, 98 L.Ed.2d 568 (1988)(comparing the Louisiana and Texas capital murder schemes and noting they each narrow those eligible for the death penalty through narrow statutory definitions of capital murder); *Jurek v. Texas*, 428 U.S. 262, 268-75, 96 S. Ct. 2950, 2955-57, 49 L.Ed.2d 929 (1976)(*plurality opinion* recognizing the Texas capital sentencing scheme narrows the category of murders for which a death sentence may be imposed and this serves the same purpose as the requirements of other statutory schemes which require proof of aggravating circumstances to justify the imposition of the death penalty).

The Texas capital sentencing scheme under which petitioner was convicted and sentenced involved a significantly different approach to capital sentencing than the Arizona scheme involved in *Ring*. By virtue of (1) its guilt-innocence phase determination *beyond a reasonable doubt* that the petitioner committed *capital* murder, as defined by applicable Texas law, and (2) its factual finding of future dangerousness, also made *beyond a reasonable doubt*, petitioner's jury found *beyond a reasonable doubt* the petitioner was *eligible* to receive the death penalty. *Sonnier v. Quarterman*, 476 F.3d at 365-67. In contrast, Ring's jury made no analogous factual findings. Instead, Ring's Arizona jury found beyond a reasonable doubt only that Ring was guilty of "felony murder," a

37

wholly separate offense from the offense of capital murder as defined under Texas law.

The petitioner's first capital sentencing special issue, i.e., the future dangerousness issue, included a "beyond a reasonable doubt" burden of proof squarely placed on the prosecution. Petitioner's jury's factual finding on the future dangerousness special issue was an essential part of the procedural process under Texas law for determining whether the petitioner was *eligible* to receive the death penalty.

In contrast, the *Penry* or "mitigation" special issue employed at the punishment phase of petitioner's capital trial was designed to address the second aspect of capital sentencing discussed in *Tuilaepa*, i.e., the constitutional requirement that the jury be given an opportunity "to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. at 172-75, 126 S. Ct. at 2524-25; *Sonnier v. Quarterman*, 476 F.3d at 365. "The use of mitigation evidence is a product of the requirement of individualized sentencing." *Kansas v. Marsh*, 548 U.S. at 174, 126 S. Ct. at 2525.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, *i.e.*, the narrowing function, and the *selection* decision, *i.e.*, the individualized assessment of mitigating circumstances, holding the latter requires

only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the states wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors. *See Kansas v. Marsh*, 548 U.S. at 174-75, 126 S. Ct. at 2525 (holding, in connection with the *selection* phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa*, 512 U.S. at 978, 114 S. Ct. at 2638 (holding, at the *selection* stage, states are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment.").

At the *selection* phase of a capital trial, the Supreme Court has left to the states the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh same in any manner the jury deems reasonable. *See Kansas v. Marsh*, 548 U.S. at 174, 126 S. Ct. at 2525 ("So long as a state system satisfies these requirements, our precedents establish that a State

39

enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."). Likewise, the Supreme Court has not yet imposed a particular burden of proof requirement with regard to a capital sentencing jury's consideration of mitigating evidence when such consideration occurs exclusively within the selection process.

> "[D]iscretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty,...the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa*, 512 U.S. at 979, 114 S. Ct. at 2639 (citations omitted).

"[T]here is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Johnson v. Texas*, 509 U.S. at 362, 113 S. Ct. at 2666 (*quoting Boyde v. California*, 494 U.S. 370, 377, 110 S. Ct. 1190, 1196, 108 L.Ed.2d 316 (1990)). "We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Kansas v. Marsh*, 548 U.S. at 175, 126 S. Ct. at 2525.

As explained above, the "eligibility" decision required by the Constitution is satisfied under Texas law by the jury's findings "beyond a reasonable doubt" that (1) the defendant is guilty of capital murder as defined under Section 19.03 of the Texas Penal Code and (2) there is a probability the defendant will commit criminal acts of violence that would constitute a continuing threat to society. *Sonnier v. Quarterman*, 476 F.3d at 365-67. This is all the Constitution requires to satisfy the concerns discussed by the Supreme Court in *Ring*.

Consistent with the Supreme Court's holdings in *Kansas v. Marsh*, *Tuilaepa v. California*, and *Johnson v. Texas*, a Texas capital sentencing jury may be granted "unfettered discretion" regarding how it should weigh the mitigating evidence, if any, relevant to a particular defendant's background and character against the aggravating circumstances of the defendant's offense and the defendant's demonstrated propensity for future dangerousness. Thus, the Texas Legislature's decision *not* to assign a particular burden of proof on either party in connection with the Texas capital sentencing scheme's *Penry* or mitigation special issue falls well within the broad range of discretionary authority a state may exercise in connection with the *selection* phase of a capital trial.

The Arizona trial judge's affirmative factual finding regarding the existence of an aggravating factor made in *Ring* did

not serve the same constitutionally-mandated purpose as the jury's negative answer to the *Penry* special issue made at petitioner's Texas capital murder trial. The Arizona trial judge's factual findings were designed to satisfy the "eligibility" requirement discussed in *Tuilaepa*. In jurisdictions such as Texas (where the "eligibility" decision discussed in *Tuilaepa* is made at the guilt-innocence phase of a capital trial) the only factual issues before the jury at the punishment phase of a capital trial address only the "selection" decision identified by the Supreme Court in *Tuilaepa*. Even if Texas's future dangerousness special issue could be construed as falling within the scope of the constitutionally mandated eligibility decision, Texas law clearly places the burden of proving same beyond a reasonable doubt on the prosecution.

Thus, the procedural requirements applicable to the *eligibility* decision in weighing jurisdictions such as Arizona (where specific findings of aggravating factors are made during a separate post-conviction proceeding and then weighed against any "mitigating" factors also found by the sentencing authority) are inapplicable to a Texas capital sentencing jury's *selection* decision, *i.e.*, its determination as to whether the mitigating evidence in a particular case warrants a sentence of less than death for a criminal defendant who has already been convicted beyond a reasonable doubt of capital murder and already determined beyond a reasonable doubt to pose a risk of future dangerousness.

*See Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007)("[A] finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death."); *Sonnier v. Quarterman*, 476 F.3d at 363-67 (holding the deletion of the former special issue inquiring into whether the defendant acted "deliberately" in connection with the capital murder from the Texas capital sentencing scheme did not render same vulnerable to attack on Eighth Amendment grounds); *Granados v. Quarterman*, 455 F.3d 529, 537 (5th Cir. 2006)(distinguishing *Ring* and *Apprendi* on the ground that a jury's affirmative answer to the Texas capital sentencing scheme's *Penry* or "mitigation" special issue reduces a sentence from death rather than increasing it to death, as was the case with the factual findings made by the trial judges in *Apprendi* and *Ring*), *cert. denied*, 549 U.S. 1081 (2006); *Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005)("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."), *cert. denied*, 546 U.S. 848 (2005). For the foregoing reasons, the exercise of considerable discretion by a Texas capital sentencing jury when confronting the *Penry* or mitigation special issue does not violate Eighth Amendment principles. *Bartee v. Quarterman*, 574 F. Supp. 2d 624, 704-05 (W.D. Tex. 2008), *CoA denied*, ___ Fed. App'x ___, 2009 WL 2981896 (W.D. Tex. September 18, 2009); *Moore v. Quarterman*, 526 F. Supp. 2d 654, 730-31 (W.D. Tex. 2007), *CoA denied*, 534 F.3d 454 (5th Cir. 2008).

Finally, petitioner's complaint about the lack of definitions of specific terms employed in the Texas capital sentencing special issues, which petitioner deems to be unconstitutionally vague, has been repeatedly rejected by both the Fifth Circuit and this Court for the same reasons petitioner's other facial challenges to the Texas capital sentencing scheme lack arguable merit. *See Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir.)(rejecting arguments that the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of mitigating evidence), *cert. denied*, 551 U.S. 1193 (2007); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005)(listing the many Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society" in the first Texas capital sentencing special issue), *cert. denied*, 547 U.S. 1073 (2006); *Bartee v. Quarterman*, 574 F. Supp. 2d at 693-94 (listing Fifth Circuit opinions and opinions of this Court rejecting complaints about the failure of Texas courts to define various terms employed in the capital sentencing special issues); *Moore v. Quarterman*, 526 F. Supp. 2d at 720-21 (discussing the long line of Fifth Circuit opinions, as well as numerous opinions from this Court, rejecting the same arguments raised by petitioner's twenty-second claim herein); *Martinez v. Dretke*, 426 F. Supp. 2d 403, 530 (W.D. Tex.

44

2006)(holding the Texas capital sentencing special issues need not be accompanied by definitions because the key terms therein are susceptible of a logical, commonsense, interpretation by rational jurors and the Eighth Amendment does not preclude granting a Texas jury unfettered discretion (in the mitigation special issue) to *withhold* the death penalty so long as the jury is permitted to consider all mitigating evidence before it in so doing), *CoA denied*, 270 Fed. Appx. 277, 2008 WL 698946 (5th Cir. March 17, 2008); *Salazar v. Dretke*, 393 F. Supp. 2d 451, 488-91 (W.D. Tex. 2005)(holding the same), *aff'd*, 260 Fed. App'x 643, 2007 WL 4467587 (5th Cir. December 20, 2007), *cert. denied*, ___ U.S. ___, 128 S. Ct. 2963, 171 L.Ed.2d 893 (2008).

    4.  <u>Conclusion</u>

    The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Ring* challenge to the facial constitutionality of the Texas capital sentencing scheme was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial court and state habeas corpus proceedings. Petitioner's sixth claim herein does not warrant federal habeas relief under the AEDPA.

## V. **Hearsay, Confrontation Clause,** *Dawson v. Delaware,* **and Cumulative Error Arguments**

A.   The Claims

Petitioner argues in his first three claims herein that his Fifth Amendment Due Process and Sixth Amendment Confrontation Clause rights were violated when the state trial court erroneously admitted hearsay evidence during the punishment phase of petitioner's capital murder trial. Petitioner argues the state trial court erroneously admitted evidence showing the following: (1) that Jessica had once sought assistance from the Bexar County Battered Women's Shelter after petitioner assaulted her; and (2) petitioner once identified himself as a member of a notorious street gang. Petitioner also argues the cumulative effect of the admission of this evidence denied him a fair trial. *Second Amended Petition, at pp. 35-74.*

B.   State Court Disposition

Petitioner presented the first two of these complaints to the Texas Court of Criminal Appeals as his fourth and fifth points of error on direct appeal. The state appellate court concluded (1) there was no error in the admission of evidence showing petitioner's street gang affiliation and (2) while it was error to admit the hearsay-within-hearsay evidence contained in Jessica Garcia's Battered Women's Shelter admission records, any error in connection with that admission was harmless because there was ample evidence, including petitioner's fatal assault upon Jessica,

46

establishing petitioner's pattern of abusive conduct toward Jessica and there was also ample evidence supporting the jury's affirmative answer to the future dangerousness capital sentencing special issue. *Garcia v. State*, 126 S.W.3d at 925-28.

Petitioner did not present his "cumulative error" claim to the state courts in either his direct appeal or state habeas corpus proceeding. However, respondent does not raise petitioner's failure to exhaust state remedies as a basis for denying petitioner's cumulative error claim.

C. <u>AEDPA Analysis</u>

1. <u>Double Hearsay Within Battered Women's Shelter Records</u>

The state appellate court concluded the erroneous admission of business records from the Bexar County Battered Women's Shelter showing Jessica Garcia had sought assistance from that facility in December 1994, after she was physically and emotionally abused by petitioner, was harmless in light of the other evidence properly admitted, including the testimony of the San Antonio Police Officer who transported Jessica to the Battered Women's Shelter in December 1994. *Garcia v. State*, 126 S.W.3d at 927-28.

In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire*, 502 U.S. at 67-68, 112 S. Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110 S. Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S. Ct. at 874.

> When a federal district court reviews a state
> prisoner's habeas petition pursuant to 28 U.S.C. § 2254
> it must decide whether the petitioner is "in custody in
> violation of the Constitution or laws or treaties of the
> United States." The court does not review a judgment,
> but the lawfulness of the petitioner's custody
> *simpliciter*.

*Coleman v. Thompson*, 501 U.S. at 730, 111 S. Ct. at 2554.

A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Goodrum v. Quarterman*. 547 F.3d 249, 261 (5th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S. Ct. 1612, 173 L.Ed.2d 1000 (2009); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005), *cert. denied*, 546 U.S. 1217 (2006).

Thus, the question before this Court is not whether the state trial court properly applied state procedural rules but, rather, whether petitioner's federal constitutional rights were violated by the state trial court's finding of harmless error in the admission of the hearsay-within-hearsay contained in the Battered Women's Shelter's records in question. *See Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir.)(holding federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the federal Constitution), *cert. denied*, 546 U.S. 900 (2005).

Petitioner's Confrontation Clause complaint is likewise subject to harmless error analysis. *See Delaware v. Van Arsdall*,

475 U.S. 673, 680-84, 106 S. Ct. 1431, 1436-38, 89 L.Ed.2d 674 (1986)(holding violation of the Confrontation Clause properly subject to harmless error analysis); *United States v. Stalnaker*, 571 F.3d 428, 434 (5th Cir. 2009)(Confrontation Clause violations are subject to harmless error analysis).

The federal standard for harmless error, which this Court must apply in the context of a federal habeas corpus proceeding, is whether the error had a substantial and injurious effect on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)(holding the test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict").

The state appellate court correctly concluded there was ample evidence to support the jury's affirmative answer to the future dangerousness special issue, as well as a plethora of evidence that established petitioner's history of abusive conduct toward his wife. During the guilt-innocence phase of petitioner's capital murder trial, petitioner's jury heard petitioner's written statement read into evidence. In his statement, petitioner admitted that the night before the fatal shootings, he and Jessica had a violent confrontation during which he struck Jessica and

shook her until their children began to cry.[37]  Petitioner also admitted in his statement that (1) upon returning home the morning of the murders, he grabbed his wife and pulled her inside the house and (2) after fatally shooting officer Garza, he fatally shot Jessica while she was kneeling on the floor.[38]  The jury also heard testimony from multiple witnesses that, when he arrived at the Garcia residence, petitioner grabbed Jessica violently and dragged her back inside the house.[39]  Jessica's autopsy revealed she had been shot three times, the last two likely when she was already lying face down on the floor.[40]

During the punishment phase of petitioner's capital murder trial, one of Jessica's co-workers testified on different occasions she witnessed (1) choke marks on Jessica's neck, (2) Jessica with a busted lip and bruises, and (3) only a few months before the fatal shooting, Jessica's hair, in which Jessica took great pride, cut very short.[41]

---

[37] State Exhibit no. 115; S.F. Trial, Volume 20, testimony of Thomas Matjeka, at pp. 192-93.

[38] S.F. Trial, Volume 20, testimony of Thomas Matjeka, at pp. 195-98.

[39] S.F. Trial, Volume 17, testimony of Sylvia Duran, at p. 92; Volume 20, testimony of John Luna, at p. 20.

[40] S.F. Trial, Volume 18, testimony of Dr. Robert C. Bux, at pp. 95-111.

[41] S.F. Trial, Volume 23, testimony of Gloria Mireles, at pp. 25-28.

Given the record then-before petitioner's jury, this Court independently concludes the erroneous admission of hearsay-within-hearsay information contained within the records from the Bexar County Battered Women's Shelter (indicating Jessica had sought assistance from that facility several years before the date of the fatal shooting following acts of physical abuse perpetrated against her by petitioner) had no substantial and injurious effect or influence in determining the jury's verdict during the punishment phase of petitioner's capital murder trial. Thus, there was nothing objectively unreasonable, in light of clearly established federal law and the evidence then before the state court, with the state appellate court's conclusion of harmless error. Furthermore, admission of the hearsay-within-hearsay information in question did not render the punishment phase of petitioner's capital murder trial fundamentally unfair. Finally, the admission of hearsay during the punishment phase of a capital trial does not, standing alone, implicate Confrontation Clause concerns. *See United States v. Fields*, 483 F.3d 313, 325-38 (5th Cir. 2007)(holding the Confrontation Clause does not apply to complaints about the admission of hearsay evidence during the punishment phase of a federal capital trial), *cert. denied*, ___ U.S. ___, 128 S. Ct. 1065, 169 L.Ed.2d 814 (2008).

2.    <u>Evidence of Gang Affiliation</u>

Petitioner complains the prosecution was permitted to introduce evidence showing petitioner had informed a police officer in 1992 that he (petitioner) was a member of a street gang named the "Angels of Sin." The state appellate court found admission of this testimony was relevant to show petitioner's bad character because the prosecution proved not merely the petitioner's membership in the gang but also the gang's violent and illegal activities. *Garcia v. State*, 126 S.W.3d at 928.

Petitioner does not identify any specific federal constitutional procedural guarantee that was violated by virtue of the admission of this testimony, other than the First Amendment right recognized in by the Supreme Court in *Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093, 117 L.Ed.2d 309 (1992). In *Dawson v. Delaware*, the Supreme Court specifically held that it is proper for a capital sentencing jury to consider evidence of the defendant's racial intolerance and subversive advocacy where such evidence is relevant to the issues before the jury. *Dawson v. Delaware*, 503 U.S. at 164-65, 112 S. Ct. at 1097. The particular evidence in that case, however, i.e., Dawson's membership in the Aryan Brotherhood, was unaccompanied by any showing Dawson's capital offense was racially motivated or in anyway endorsed by the Aryan Brotherhood and was not relevant to rebut any mitigating evidence proffered by the defense. Therefore, the Supreme Court concluded

the evidence was irrelevant to any issue before the sentencing jury. *Id.*, 503 U.S. at 166-67, 112 S. Ct. at 1098-99. The Supreme Court took great pains in *Dawson*, however, to explain that the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the Constitution. *Id.*, 503 U.S. at 165, 112 S. Ct. at 1097. The constitutional flaw in the prosecution's reliance on Dawson's membership in the Aryan Brotherhood, the Supreme Court explained, was the prosecution's failure to introduce other evidence tying Dawson's membership to any of the considerations before the sentencing jury. *Id.*, 503 U.S. at 166-67, 112 S. Ct. at 1097-98. The Supreme Court also expressly recognized "associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." *Id.*, 503 U.S. at 166, 112 S. Ct. at 1098.

In contrast to the circumstances of *Dawson*, evidence of petitioner's membership in the Angels of Sin was combined with testimony from a veteran police officer familiar with gang activities during the time petitioner professed membership in that gang, that established the Angels of Sin was a violent street gang engaged in drug dealing, aggravated assaults, auto theft, and numerous drive-by shootings targeting a rival gang on neighboring

soil.[42]  Under such circumstances, the constitutional defect found in *Dawson* was absent from petitioner's trial.  Admission of the testimony establishing petitioner's professed membership in a violent street gang in 1992 did not render the punishment phase of petitioner's capital trial fundamentally unfair.  There was, therefore, no constitutional error in the admission of the testimony regarding petitioner's gang affiliation. *Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir.)(evidence a defendant was a member of a violent gang that had committed unlawful acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults was relevant to the jury's answer to the future dangerousness special issue and did not violate the defendant's First Amendment rights under *Dawson*), *cert. denied*, 522 U.S. 963 (1997).

Moreover, this Court independently concludes the admission of the testimony by Officer Schiller identifying petitioner as a member of a violent street gang in 1992, even if constitutionally erroneous, did not have a substantial and injurious effect or influence in determining the jury's verdict at the punishment phase of petitioner's capital murder trial.  Petitioner was convicted on overwhelming evidence of fatally shooting a uniformed San Antonio Police Officer.  Equally overwhelming evidence established

---

[42] S.F. Trial, Volume 23, testimony of John Schiller, at pp. 31-37.

petitioner fatally shot his own wife, wounded another individual with a firearm, and shot up his entire neighborhood, including a nearby elementary school while school was in session. Petitioner's propensity for future violence was firmly established by his numerous violent actions on the morning of the murders in question and not rebutted by any evidence showing petitioner had ever expressed any remorse for his crimes.

3.  Cumulative Error

Petitioner argues his constitutional rights were violated by the cumulative effect of the allegedly erroneous admission of his gang affiliation and Jessica's efforts years before to seek assistance from the Battered Women's Shelter. However, as explained above, admission of the testimony in question did not deprive petitioner of any specific federal constitutional right or of a fundamentally fair state capital punishment hearing. Moreover, this Court has independently concluded that any error in the admission of either of these bits of evidence was harmless. Accordingly, there is simply no harm to cumulate. *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1993), *cert. denied*, 508 U.S. 960 (1993). This Court independently concludes petitioner's cumulative error claim does not warrant federal habeas corpus relief, even when reviewed under a *do novo* standard.

D.    Conclusions

The state appellate court's rejections on the merits of petitioner's complaints about the admission of the double hearsay within the Battered Women's Shelter's record and of Officer Schiller's testimony regarding petitioner's professed membership in the violent street gang known as the Angels of Sin were neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor were they based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial or direct appeal.  Petitioner's cumulative error claim does not warrant federal habeas relief because any trial court error in connection with the admission of the evidence in question was harmless, at best.

## VI. **Ineffective Assistance by Trial Counsel**

A.    The Claim

Petitioner argues in his fifth claim herein that his trial counsel rendered ineffective assistance by failing to adequately investigate, develop, and present potentially mitigating evidence, including evidence of petitioner's mental retardation and mental defects.  *Second Amended Petition, at pp. 91-111.*

B.    State Court Disposition

Petitioner presented this same claim as his eleventh, twelfth, and twenty-first claims in his state habeas corpus application.  As

56

was explained at length in Section III.B. above, the state habeas trial court held an evidentiary hearing and heard testimony regarding this aspect of petitioner's state habeas claims. However, the state habeas trial court concluded, in an eminently reasonable manner, (1) petitioner's trial counsel extensively investigated petitioner's background and mental health, consulted with a mental health expert who had examined petitioner, and made a reasonable decision not to present psychological mitigating evidence because to do would have necessarily meant introducing double-edged evidence, (2) petitioner presented no evidence showing either that petitioner was mentally retarded or that any other, undiscovered, potentially mitigating, evidence was available at the time of petitioner's trial, and (3) petitioner had failed to satisfy either prong of the applicable *Strickland v. Washington* standard.[43]    The Texas Court of Criminal Appeals adopted these conclusions when it denied petitioner's state habeas corpus application. *Ex parte Frank M. Garcia,* 2007 WL 1783194 (Tex. Crim. App. June 20, 2007).

C.   AEDPA Analysis

    1.   The Constitutional Standard of Review

    The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the

---

[43] State Habeas Transcript, at pp. 220-22.

Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, *i.e.*, establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S. Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S. Ct. at 2064-66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S. Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective

58

review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S. Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S. Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. at 534, 123 S. Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert.*

*denied*, 540 U.S. 1154 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390, 125 S. Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S. Ct. at 2542 (holding the same).

2.  <u>Burden to Overcome Presumption of Reasonableness</u>

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S. Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S. Ct. at 2066.

Furthermore, under the AEDPA, in order to obtain federal habeas relief on an ineffective assistance claim rejected on the

60

merits by a state court, the petitioner must do more than convince the federal court that the state court applied *Strickland* incorrectly – the petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Bell v. Cone*, 535 U.S. at 699, 122 S. Ct. at 1852.

The fundamental analytical problem with petitioner's complaint of ineffective assistance by his trial counsel in this cause is the fact petitioner failed to present the state habeas court with any evidence suggesting there was anything *objectively* unreasonable about the failure of petitioner's trial counsel to present evidence showing petitioner was mentally retarded or otherwise suffered from any mental defect. Petitioner did not present the state habeas court with any testimony, expert reports, medical records, school records, or other evidence showing petitioner had ever been diagnosed as mentally retarded or as having any recognized mental defect.

While petitioner's sister did suggest petitioner struggled academically and was placed in Special Education classes while in school, she failed to elaborate on the basis for that assignment. Students are placed in Special Education programs for many reasons unrelated to their intellectual functioning level, including vision and hearing impairments, physical handicaps, speech impediments, and a host of learning disabilities such as dyslexia. Thus, petitioner's purported assignment to Special Education classes does

not, standing alone, furnish any basis for a finding petitioner was ever diagnosed as mentally retarded.

Moreover, attorney Michael C. Gross, petitioner's former lead trial counsel, testified the defense team's mental health expert, Dr. Jack Ferrell, examined petitioner and reported to defense counsel that petitioner's IQ was within the normal range. Petitioner offered the state habeas court no evidence suggesting there was any deficiency in Dr. Ferrell's analysis of petitioner's IQ prior to petitioner's trial. Petitioner did not call Dr. Ferrell to testify during petitioner's state habeas corpus hearing or otherwise challenge the reasonableness of Dr. Ferrell's clinical findings or professional opinions. Nor did petitioner offer the state habeas court any other expert opinion testimony suggesting petitioner was displaying significantly sub-average intellectual functioning prior to petitioner's capital murder trial. Attorney Gross also testified without contradiction during the state habeas hearing (1) he had no difficulty communicating with petitioner, whom Gross testified communicated "extremely well," (2) the defense team interviewed fifty-to-sixty persons who knew petitioner but found "zero evidence" suggesting petitioner was mentally retarded or suffered from any other mental defect, (3) Dr. Ferrell opined that petitioner was remorseless, cold-blooded, and possessed an anti-social personality, (4) there was no evidence suggesting petitioner had been the victim of an abused or neglected childhood,

and (5) based upon the foregoing facts, the defense chose not to present any psychologically-based mitigating evidence.[44] Thus, petitioner presented the state habeas court with no evidence sufficient to overcome the presumption that the actions of petitioner's trial counsel in not presenting mitigating evidence of petitioner's allegedly low intellectual functioning was anything other objectively reasonable given the information available to said counsel at the time of petitioner's capital murder trial. Absent some showing that a counsel's subjective decision-making was *objectively* unreasonable in view of the information and evidence available to said counsel, it is virtually impossible for a habeas corpus petitioner to overcome the presumption of reasonableness afforded his counsel's strategic and tactical decisions under *Strickland*. *See Gutierrez v. Dretke*, 392 F. Supp. 2d 802, 875-76 (W.D. Tex. 2005), *CoA denied*, 201 Fed. Appx. 196, 2006 WL 2711967 (5th Cir. September 21, 2006)(recognizing the burden on a habeas petitioner asserting a *Wiggins* claim includes demonstrating that, in light of the potentially mitigating evidence and information available at the time of trial, his trial counsel's efforts to investigate, develop, and present potentially mitigating evidence were *objectively* unreasonable), *cert. denied*, 549 U.S. 1227 (2007).

---

[44] State Habeas Hearing, testimony of Michael C. Gross, at pp. 24-29, 32, 34, 40-42, 47-49.

It is absolutely essential a habeas petitioner asserting an ineffective assistance claim, arising from deficient performance not manifested on the face of the trial or appellate record, develop and present the state habeas court with evidence establishing the objective unreasonableness of his trial counsel's performance *in light of the circumstances as they existed at the time of the petitioner's trial*. *Id.* This necessarily requires inquiry into the quality of said trial counsel's subjective thought processes and the objective reasonableness of same. *See Moore v. Quarterman*, 526 F. Supp. 2d at 694-96 (holding inquiry into the subjective thought process of trial counsel was necessary to support non-record-based ineffective assistance claims).

While petitioner presented the state habeas court with a "non-record" ineffective assistance claim, *i.e.*, a claim asserting his counsel failed to present mitigating evidence regarding petitioner's alleged mental retardation at the time of petitioner's capital trial, petitioner failed to present the state habeas court with any evidence showing, in fact, there was any potentially mitigating evidence available at the time of petitioner's capital murder trial that petitioner's trial counsel could have presented to petitioner's capital sentencing jury to prove petitioner was mentally retarded or mentally deficient. The record before the state habeas court established Dr. Ferrell examined petitioner and concluded petitioner was not mentally retarded but of "normal

intelligence." Petitioner presented the state habeas court with no evidence showing petitioner's trial counsel acted unreasonably in relying upon Dr. Ferrell's conclusions.

3.  No Deficient Performance

A trial counsel's failure to investigate, develop, and present mitigating evidence can rise to the level of ineffective assistance. However, the appropriate standard for reviewing such a claim requires examination of the objective reasonableness of trial counsel's strategic and tactical decision-making in light of the information known or otherwise available to said counsel. *Wiggins v. Smith*, 539 U.S. at 523, 123 S. Ct. at 2536. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S. Ct. at 2066.

As was explained at length above, during petitioner's state habeas hearing, petitioner's former lead trial counsel testified, without contradiction, that (1) the defense team's initial plan was to present a psychological defense but, after the defense's forensic psychologist examined petitioner, that option "did not pan out," (2) the defense's forensic psychologist concluded petitioner's IQ was "normal," (3) he had worked with the defense's mental health expert, Dr. Jack Ferrell, previously and had every confidence in Dr. Ferrell's opinion, (4) Dr. Ferrell concluded

petitioner's IQ was not something the defense could employ in mitigation at the punishment phase of trial, (5) he reviewed petitioner's school and employment records and was unable to develop any evidence support a finding of mental retardation or an insanity defense, (6) the defense team interviewed between fifty and sixty persons who knew petitioner but were unable to find anyone who could testify petitioner displayed deficits in adaptive behavior while growing up, (7) none of petitioner's family members offered anything of a mitigating nature regarding petitioner's childhood, (8) he had no difficulty communicating with petitioner or getting information from petitioner, who communicated "extremely well," (9) petitioner's whole family told him petitioner had no problems in school, (10) none of petitioner's family ever told him petitioner had been in Special Education classes, (11) petitioner's family described petitioner's childhood as normal, (12) Dr. Ferrell expressed opinions regarding petitioner that were double-edged in nature, such as his opinions that petitioner was remorseless, cold-blooded, and possessed an antisocial personality, (13) some members of petitioner's family had given interviews with the news media after the shootings in which they described their own fear of petitioner, (14) he never found any evidence suggesting petitioner suffered an abused or neglected childhood, and (15) there was no

evidence petitioner was unable to perform his job.[45]

Equally significant is the fact petitioner made no showing during his state habeas hearing that there was any evidence available at the time of petitioner's trial to show either (1) petitioner was mentally retarded, i.e., displayed significantly sub-average intellectual functioning and had demonstrated significant deficiencies in any adaptive behavior areas prior to age eighteen, (2) petitioner suffered from any other mental defect, or (3) showing there was any evidence available at the time of trial to show petitioner had suffered an abused or neglected childhood.

Petitioner's trial counsel testified without contradiction during petitioner's state habeas hearing that the defense team had obtained the assistance of a qualified mental health professional who examined and evaluated petitioner prior to trial and concluded (1) petitioner's IQ was normal and would not furnish a basis for mitigation and (2) petitioner was a remorseless, cold-blooded, anti-social personality. Petitioner offered the state habeas court no evidence suggesting there was anything professionally deficient or otherwise erroneous about Dr. Ferrell's opinions regarding petitioner's intellectual capabilities or petitioner's lack of remorse for his offenses. Nor did petitioner show the state habeas

---

[45] S.F. State Habeas Hearing, testimony of Michael C. Gross, at pp. 21-50.

court any other mental health professionals were available at the time of petitioner's trial who could have given expert opinions more helpful in mitigation than Dr. Ferrell's double-edged opinions. Petitioner offered the state habeas court no evidence suggesting there was anything objectively unreasonable with the decision by petitioner's trial counsel not to pursue further evidence regarding petitioner's mental health or intelligence level.

Under such circumstances, there was nothing objectively unreasonable with the decision of petitioner's trial counsel not to further investigate, develop, or present psychologically-based mitigating evidence, which necessarily would have opened the door to testimony addressing the double-edged nature of Dr. Ferrell's opinions. *See Martinez v. Quarterman*, 481 F.3d 249, 254-58 (5th Cir. 2007)(strategic decision not to further investigate or present evidence suggesting the defendant had committed the offense during the course of a temporal lobe epileptic seizure was objectively reasonable where such a tactic would necessarily have disclosed double-edged evidence showing the defendant suffered from a mental disorder which caused savage and uncontrolled aggressiveness), *cert. denied*, ___ U.S. ___, 128 S. Ct. 1072, 169 L.Ed.2d 816 (2008). It has long been recognized in this Circuit that a tactical decision not to pursue and present potentially mitigating evidence on the grounds it is double-edged in nature is objectively

reasonable and, therefore, does not amount to deficient performance. *St. Aubin v. Quarterman*, 470 F.3d at 1103; *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.), *cert. denied*, 540 U.S. 968 (2003); *Foster v. Johnson*, 293 F.3d 766, 778-79 (5th Cir.), *cert. denied*, 537 U.S. 1054 (2002); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997), *cert. denied*, 522 U.S. 1120 (1998). The state habeas court acted in a reasonable manner when it concluded petitioner had failed to satisfy the initial prong of the *Strickland* test.

### 4. No Prejudice

Finally, petitioner failed to present the state habeas court with any evidence showing that, but for the failure of his trial counsel to undertake a more thorough investigation into petitioner's intelligence and mental health, additional mitigating evidence might have been developed and become available for presentation at the punishment phase of petitioner's capital murder trial. As was explained in detail above, petitioner presented the state habeas court with no evidence showing petitioner had ever been diagnosed as mentally retarded, had ever tested below the normal range on a standardized IQ testing instrument, or had been identified as displaying significant deficiencies in adaptive behavior prior to age eighteen. Nor did petitioner present the state habeas court with any testimony, medical or school records, or other evidence available at the time of petitioner's capital

trial showing petitioner suffered from any recognized mental defect. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994)(holding absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot even begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance). Petitioner failed to present any evidence to the state habeas court showing that, but for the failure of his trial counsel to undertake a more thorough investigation into petitioner's background, intelligence, or mental health, additional mitigating evidence would have been available for introduction at the punishment phase of petitioner's capital murder trial.

The evidence before the jury during the punishment phase of petitioner's trial included not merely petitioner's written statement confessing to his having fatally shot both Officer Garza and petitioner's wife, but compelling eyewitness testimony establishing (1) petitioner also fired at others with a high-powered weapon that same morning, (2) petitioner fired at and struck John Luna in the leg as Luna attempted to flee the scene, (3) petitioner's rampage caused considerable damage to Luna's automobile parked outside the Garcia residence, as well as to the

same Bill Miller truck petitioner had driven to the scene, and (4) petitioner's gunfire also left a hole in a window screen and numerous indentations in the front doors of a nearby elementary school. Following the murders, petitioner's demeanor was described by law enforcement personnel as "cocky," "arrogant," and "very calm."[46] To this date, there is no evidence suggesting petitioner has ever expressed any remorse for his capital offense.

The state habeas court acted in an eminently reasonable manner when it concluded there was no reasonable probability that, but for the failure of petitioner's trial counsel to more fully investigate, develop, and present evidence of petitioner's mental health and intelligence level, the outcome of the punishment phase of petitioner's capital murder trial would have been any different.

D.   Conclusions

The Texas Court of Criminal Appeals' conclusion in the course of petitioner's state habeas corpus proceeding that petitioner's complaint about the failure of his trial counsel to more fully investigate, develop, and present mitigating evidence regarding petitioner's mental health and intelligence level failed to satisfy either prong of the *Strickland* test was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United

---

[46] S.F. Trial, Volume 19, testimony of Robert Carter, at p. 119; Volume 20, testimony of Thomas Matjeka, at pp. 182, 187.

States, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial or direct appeal.

## VII. <u>Juror Bias & Ineffective Assistance by Appellate Counsel</u>

A.    <u>The Claims</u>

Petitioner argues in his fourth claim herein that his state appellate counsel rendered ineffective assistance by failing to present a point of error on direct appeal challenging the state trial court's failure to exclude a biased juror from service on petitioner's jury.  More specifically, petitioner argues juror Maria Esparza was biased and unqualified and should have been excluded.  Petitioner argues Esparza's presence on his petit jury deprived him of a fair trial because Esparza stated during her voir dire examination that she had formed the opinions the petitioner was guilty and a violent person from media reports about the incident in question.

B.    <u>Failure to Exhaust Available State Court Remedies</u>

Petitioner did not "fairly present" either of his complaints about Esparza's alleged bias or the failure of petitioner's appellate counsel to raise a point of error complaining about same to the state courts on direct appeal or in the course of petitioner's state habeas corpus proceeding.

C.    <u>Procedural Default</u>

Respondent correctly points out petitioner has procedurally

defaulted on both his ineffective appellate assistance and biased juror claims by failing to present same to the appropriate state courts.

1. <u>The Duty to Exhaust Available State Remedies</u>

Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the state the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights. *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L.Ed.2d 64 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 30 L.Ed.2d 438 (1971); 28 U.S.C. §2254(b)(1). To provide the state with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim. *See Baldwin v. Reese*, 541 U.S. at 29-32, 124 S. Ct. at 1349-51 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan v. Boerckel*, 526 U.S. at 844-45, 119 S. Ct. at 1732-33 (holding comity requires

that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that state's established appellate review process); *Gray v. Netherland*, 518 U.S. 152, 162-63, 116 S. Ct. 2074, 2081, 135 L.Ed.2d 457 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief). The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. *Carey v. Saffold*, 536 U.S. 214, 220, 122 S. Ct. 2134, 2138, 153 L.Ed.2d 260 (2002); Duncan v. Walker, 533 U.S. 167, 179, 121 S. Ct. 2120, 2128, 150 L.Ed.2d 251 (2001); *O'Sullivan v. Boerckel*, 526 U.S. at 845, 119 S. Ct. at 1732; *Rose v. Lundy*, 455 U.S. 509, 518-19, 102 S. Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003)("28 U.S.C. § 2254(b)(1) requires that federal habeas petitioners fully exhaust remedies available in

state court before proceeding in federal court."), *cert. denied*, 543 U.S. 835 (2004),; *Riley v. Cockrell*, 339 F.3d 308, 318 (5th Cir. 2003); *Henry v. Cockrell*, 327 F.3d 429, 432 (5th Cir.)("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."), *cert. denied*, 540 U.S. 956 (2003); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998), *cert. denied*, 528 U.S. 895 (1999). However, 28 U.S.C. §2254(b)(2) empowers a federal habeas court to deny an exhausted claim on the merits. *Pondexter v. Quarterman.* 537 F.3d 511, 527 (5th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S. Ct. 1544, 173 671 (2009). The exhaustion of *all* federal claims in state court is a fundamental prerequisite to requesting federal collateral relief under 28 U.S.C. Section 2254. *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); *Sterling v. Scott*, 57 F.3d 451, 453 (5th Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996); 28 U.S.C. §2254(b)(1)(A).

In order to "exhaust" available state remedies, a petitioner must "fairly present" *all* of his claims to the state courts. *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. at 270, 275-76, 92 S. Ct. 509, at 512-13, 30 L.Ed.2d 438 (1971); *Kunkle v. Dretke*, 352 F.3d at 988; *Riley v. Cockrell*, 339 F.3d at 318; *Shute v. State of Texas*, 117 F.3d at 237 ("a habeas petitioner 'must fairly apprize the highest court of his state of the federal rights which were

allegedly violated.'"). In Texas, the highest state court with jurisdiction to review the validity of a state criminal conviction is the Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429, 431-32 (5th Cir. 1985).

More simply, the exhaustion doctrine requires that the petitioner present his *federal* claim in a manner reasonably designed to afford the state courts a meaningful opportunity to address same. The exhaustion requirement is satisfied when the substance of the *federal* habeas claim has been "fairly presented" to the highest state court, *i.e.*, the petitioner presents his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin v. Reese*, 541 U.S. at 29-32, 124 S. Ct. at 1349-51 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003). However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented" and thereby fulfill the exhaustion requirement. *Riley v. Cockrell*, 339 F.3d at 318; *Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir. 1999).

The presentation of claims for the first time on discretionary

review to the state's highest court does *not* constitute "fair presentation" for exhaustion purposes. *Castille v. Peoples*, 489 U.S. 346, 351, 109 S. Ct. 1056, 1060, 103 L.Ed.2d 380 (1989); *Satterwhite v. Lynaugh*, 886 F.2d at 92. Full exhaustion of *all* claims presented is required before federal habeas corpus relief is available. *Rose v. Lundy*, 455 U.S. 509, 518-22, 103 S. Ct. 1198, 1203-05, 71 L.Ed.2d 379 (1982).

The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless*, 459 U.S. 4, 6-7, 103 S. Ct. 276, 277-78, 74 L.Ed.2d 3 (1982); *Riley v. Cockrell*, 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the State court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the State court."); *Wilder v. Cockrell*, 274 F.3d at 259 ("where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement"); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001). Likewise, to have "fairly presented" his <u>federal</u> claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Wilder v. Cockrell*, 274 F.3d at 260 ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law

evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights.").

2. <u>Procedural Default on Unexhausted Claims</u>

The Fifth Circuit has consistently held that federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred under the procedural default doctrine. *See, e.g., Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005)(holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling), *cert. denied*, 547 F.3d 1136 (2006); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004)(holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied*, 543 U.S. 1124 (2005); *Bagwell v. Dretke*, 372 F.3d 748, 755-56 (5th Cir. 2004)(holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application), *cert. denied*, 543 U.S. 989 (2004); *Cotton v. Cockrell*, 343 F.3d 746, 755 (5th Cir. 2003)(holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied*, 540 U.S. 1186 (2004).

Section 5 of Article 11.071 of the Texas Code of Criminal procedure prohibits a successive state habeas corpus application

except in limited circumstances that do not apply to petitioner's complaints of alleged juror bias or ineffective assistance by petitioner's appellate counsel. *See* Art. 11.071, §5, Tex. Code Crim. Proc. Ann. (Vernon Supp. 2006)(barring consideration on the merits of new claims contained in a subsequent state habeas corpus application unless either (1) the new claims could not have been presented in a previous application because the legal or factual basis for the new claims were unavailable at the time the previous application was filed; (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the state's favor one or more of the capital sentencing special issues). Absolutely nothing prevented petitioner from asserting his biased juror claim in the course of his direct appeal or his complaint of ineffective assistance during the course of his original state habeas corpus proceeding. Likewise, petitioner alleges no facts in this Court and presented the state habeas court with no evidence that satisfies either of the final two exceptions to the Texas writ-abuse barrier erected by Section 5 of Article 11.071. On the contrary, the evidence of petitioner's guilt was overwhelming, as was the evidence supporting the jury's answers to the petitioner's capital sentencing special issues.

Nothing in petitioner's appellant's brief or state habeas corpus application "fairly presented" the Texas Court of Criminal Appeals with the same *federal constitutional* arguments contained in petitioner's fourth claim for relief before this Court. In short, nothing in petitioner's pleadings in any of his state court proceedings to date "fairly presented" any state court with the federal constitutional arguments underlying petitioner's fourth claim herein.

If petitioner were to attempt at this juncture to return to state court and assert these new federal constitutional arguments underlying his fourth claim herein in a successive state habeas application, the applicable provisions of the Texas writ-abuse statute would preclude him from doing so. Thus, petitioner failed to exhaust available state remedies on his fourth claim herein and, thereby, procedurally defaulted on same. *See Hughes v. Dretke*, 412 F.3d 582, 594-95 (5th Cir. 2005)(holding petitioner procedurally defaulted on a jury misconduct claim by presenting the state courts with purely state-law arguments supporting same and waiting until he reached federal court to first urge federal constitutional arguments), *cert. denied*, 546 U.S. 1177 (2006); *Beazley v. Johnson*, 242 F.3d 248, 264-68 (5th Cir. 2001)(holding petitioner procedurally defaulted on a claim by failing to present same to the Texas Court of criminal Appeals either on direct appeal or in a state habeas corpus application where claim was readily available

80

at the time petitioner filed his state habeas application), *cert. denied*, 534 U.S. 945 (2001); *Hicks v. Johnson*, 186 F.3d 634, 637-38 (5th Cir. 1999)(petitioner procedurally defaulted on an unexhausted claim for relief), *cert. denied*, 528 U.S. 1132 (2000).

### 3. Exceptions Inapplicable

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750, 109 S. Ct. at 2565; *Harris v. Reed*, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753, 111 S. Ct. at 2566; *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). A showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine. However, petitioner does not argue or allege any specific facts suggesting his state appellate counsel's failure to

present the same federal constitutional complaints about the trial court's rulings on the challenges for cause in question somehow rendered said counsel's performance ineffective under the standard of *Strickland v. Washington*.

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335-36, 112 S. Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346-48, 112 S. Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements that render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S. Ct. at 2523. Petitioner has alleged no specific facts satisfying this "factual innocence" standard. Because petitioner has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural defaults under the fundamental miscarriage of justice exception to the

procedural default doctrine.

D.   No Merits

Alternatively, petitioner's federal constitutional complaints about juror Esparza's alleged bias and the failure of petitioner's appellate counsel to present a point of error on direct appeal complaining about same do not present even an arguable basis for federal habeas relief.  The AEDPA permits this Court to deny relief on the merits, notwithstanding the failure of the petitioner to exhaust available state court remedies. 28 U.S.C. §2254(b)(2).

1.   Standard of Review

Because the state courts never addressed the merits of petitioner's *federal constitutional* complaints of ineffective appellate counsel and juror Esparza's alleged bias, this Court's review of those un-adjudicated claims is necessarily *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390, 125 S. Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S. Ct. at 2542 (holding the same).

2.   Biased Juror Claim

a.   Esparza's Voir Dire testimony

During her voir dire examination by the prosecution, venire

member Maria Alvina Esparza testified, in pertinent part, that (1) she had seen television and other media reports on the shootings and, based upon the little information she had heard about the case, believed petitioner had shot his wife and the officer and was a violent person, (2) nonetheless, she could keep an open mind and wait until she heard the evidence before making a decision regarding the petitioner's guilt, (3) she could render a verdict based upon the evidence, (4) she was uncertain how she would feel about the petitioner's guilt once all the evidence was in, (5) she could render a verdict based on the evidence and disregard what she had heard prior to trial, (6) she understood and could follow the burden of proof and presumption of innocence as explained by the prosecutor, (7) she understood and could follow the Fifth Amendment's command protecting the defendant's right to remain silent at trial, (8) she understood the concept of evidence beyond a reasonable doubt as explained by the prosecutor, (9) she understood the capital sentencing special issues as explained by the prosecutor, and (10) she understood the need to base a punishment phase verdict on the evidence.[47] During her examination by defense counsel, Ms. Esparza reiterated that she would need to hear the evidence before rendering her verdict and she understood

---

[47] S.F. Trial, Volume 13, voir dire examination of Maria Alvina Esparza, at pp. 99-146.

the Fifth Amendment's command.[48]  Petitioner's trial counsel neither sought a challenge for cause against Esparza nor exercised a peremptory strike against her.[49]

   b.   Clearly Established Federal Law

In *Witherspoon v. Illinois*, 391 U.S. 510, 521-23, 88 S. Ct. 1770, 1776-77, 20 L.Ed.2d 776 (1968), the Supreme Court held that prospective jurors may not be excused from sitting on a capital jury simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.  Rather, the Supreme Court held as follows:

> The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty regardless of the facts and circumstances that might emerge in the course of the proceedings.

*Witherspoon v. Illinois*, 391 U.S. at 522 n.21, 88 S. Ct. at 1777 n.21.

In *Adams v. Texas*, 448 U.S. 38, 100 S. Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court emphasized the limitations *Witherspoon* imposed on the ability of the State to exclude members of a jury venire from service on a petit capital jury and directly addressed jury selection in Texas capital murder trials:

   a juror may not be challenged for cause based on his

_____

[48] *Id.*, at pp. 147-58.

[49] *Id.*, at p. 157.

views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.  The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas*, 448 U.S. at 45, 100 S. Ct. at 2526.

In *Adams*, the Supreme Court further discussed the many practical consequences of its *Witherspoon* holding:

> If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias.  The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality. * * *
>
> [A] Texas juror's views about the death penalty might influence the manner in which he performs his role but without exceeding the 'guided jury discretion" permitted him under Texas law.  In such circumstances, he could not be excluded consistently with *Witherspoon*.
>
> The State could, consistently with *Witherspoon*, use § 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths.  But the use of § 12.31(b) to exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible. * * *
>
> [N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. * * * Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond a reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. * * * [T]he State may bar from jury service those whose beliefs about

capital punishment would lead them to ignore the law or
violate their oaths.

*Adams v. Texas*, 448 U.S. at 46-50, 100 S. Ct. at 2527-29 (citations
omitted).

In *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83
L.Ed.2d 841 (1985), the Supreme Court further clarified its
holdings in *Witherspoon* and *Adams*, holding that the proper inquiry
when faced with a venire member who expresses personal,
conscientious, or religious views on capital punishment is "whether
the juror's views would prevent or substantially impair the
performance of his duties as a juror in accordance with his
instructions and his oath." *Wainwright v. Witt*, 469 U.S. at 424,
105 S. Ct. at 852. In *Wainwright v. Witt*, the Supreme Court also
emphasized that considerable deference is to be given the trial
court's first-hand evaluation of the potential juror's demeanor and
that no particular magical incantation or word choice need
necessarily be followed in interrogating the potential juror in
this regard. *Id.*, 469 U.S. at 430-35, 105 S. Ct. at 855-58.

With these principles in mind, this Court turns to the merits
of petitioner's *Witherspoon-Witt* claim.

c.    Synthesis

The Sixth Amendment guarantees the defendant an impartial jury
and the presence of a biased juror may require a new trial. *Hatten
v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009), *cert. filed*

*September 1, 2009 (09-7012).* As was explained above, a juror is biased if his views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Wainwright v. Witt*, 469 U.S. at 424, 105 S. Ct. at 852; *Hatten v. Quarterman*, 570 F.3d at 600.

The Fifth Circuit recognizes three categories of disqualifying jury bias. *Actual bias* exists when the juror failed to answer a material question honestly on voir dire and a correct response would have provided a valid basis for a challenge for cause. *Hatten v. Quarterman*, 570 F.3d at 600; *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001), *cert. denied*, 535 U.S. 1016 (2002); *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 850, 78 L.Ed.2d 663 (1984). *Alleged bias* is ordinarily addressed in a hearing where the judge examines the juror and obtains assurances of the juror's impartiality. *Hatten v. Quarterman*, 570 F.3d at 600; *Brooks v. Dretke*, 444 F.3d 328, 330 (5th Cir. 2006); *Smith v. Phillips*, 455 U.S. 209, 217-18, 102 S. Ct. 940, 946, 71 L.Ed.2d 78 (1982). *Implied bias* arises in a narrow category of cases in which a juror can be presumed biased. *Hatten v. Quarterman*, 570 F.3d at 600; *Solis v. Cockrell*, 342 F.3d 392, 395-98 (5th Cir. 2003), *cert. denied*, 540 U.S. 1151 (2004). Petitioner alleges no facts suggesting Esparza's bias falls within the actual or implied bias categories. Instead, petitioner merely asserts Esparza's voir dire answers themselves establish her bias.

Initially, Esparza candidly admitted that, based upon the meager information about petitioner's offense she had seen and heard on local media outlets, she had concluded petitioner was guilty and was a violent person. Nonetheless, she steadfastly insisted that she could set aside her original opinions, disregard the information she had seen and heard about the case, and decide the question of the petitioner's guilt based solely upon the evidence presented during the trial. In such cases, the Supreme Court has admonished federal habeas courts to defer to the state trial judge's determination of a potential juror's bias based on the trial court's firsthand examination of the potential juror's demeanor. *Uttecht v. Brown*, 551 U.S. 1, 17-22, 127 S. Ct. 2218, 2229-31, 167 L.Ed.2d 1014 (2007); *Wainwright v. Witt*, 469 U.S. at 430-35, 105 S. Ct. at 855-58. This Court has carefully reviewed Esparza's voir dire examination in its entirety and finds nothing unreasonable with the state trial court's implicit factual determination that Esparza lacked disqualifying bias under the federal constitutional standard discussed above.

The state trial court's implicit factual determination that Esparza lacked disqualifying bias was an eminently reasonable determination of the facts. Moreover, this Court's independent, *de novo* review of Esparza's voir dire examination reaches the same conclusion under the *federal constitutional* standard set forth in *Wainwright v. Witt* and recently reiterated in *Uttecht v. Brown*. *See*

*Uttecht v. Brown*, 551 U.S. at 17-22, 127 S. Ct. at 2229-31 (emphasizing the need to defer to the trial court's broad discretion in making implicit factual findings regarding a potential juror's "substantial impairment"); *Patton v. Yount*, 467 U.S. 1025, 1036-37 & n.12, 104 S. Ct. 2885, 2891 & n.12, 81 L.Ed.2d 847 (1984) (recognizing that, even in the pre-AEDPA context, while the question of a venire member's disqualification is a mixed question of law and fact, a trial judge's determination regarding a venire member's bias is essentially a factual determination entitled to deference on collateral review); *Beazley v. Johnson*, 242 F.3d 248, 262 (5th Cir. 2001)(recognizing a trial judge's finding of bias during voir dire is a determination of fact subject to a presumption of correctness on collateral review), *cert. denied*, 534 U.S. 945 (2001). This Court finds nothing erroneous with the state trial court's implicit finding that Esparza possessed no disqualifying bias under applicable *federal* law.

      d.   <u>Conclusions</u>

Petitioner procedurally defaulted on his *federal constitutional* challenge to the state trial court's failure to *sua sponte* dismiss venire member Esparza for cause by failing to make a contemporaneous objection (or challenge for cause), failing to present a point of error on direct appeal, and failing to present to the state habeas court a claim for relief premised upon Esparza's alleged bias. This Court's independent, *de novo* review

of this federal claim yields no basis for federal habeas corpus relief. Esparza repeatedly asserted she was able to set aside the information about the case she had previously heard or seen and render her verdict based solely upon the evidence presented during trial and the law. This is all the Constitution required.

    3.   <u>Ineffective Assistance by State Appellate Counsel</u>

        a.   <u>Constitutional Standard of Review</u>

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L.Ed.2d 756 (2000)(holding a petitioner arguing ineffective assistance by his appellate counsel must establish both (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir. 2006)(holding *Strickland* furnishes the proper standard for review of a complaint of ineffective assistance by state appellate counsel), *cert. denied*, 549 U.S. 1252 (2007); *Amador v. Quarterman*, 458 F.3d at 410-11 (holding complaints of ineffective assistance by state appellate counsel are governed by the *Strickland* standard of review); *Moreno v. Dretke*, 450 F.3d 158, 168 (5th Cir. 2006)(applying the dual prongs of *Strickland* analysis

to complaints of ineffective assistance by appellate counsel), *cert. denied*, 549 U.S. 1120 (2007); *Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir.)(holding *Strickland* applies to a prisoner's claim his appellate counsel was ineffective for failing to raise a certain issue on appeal), *cert. denied*, 541 U.S. 1087 (2004).

Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins*, 528 U.S. at 285, 120 S. Ct. at 764; *Henderson v. Quarterman*, 460 F.3d at 665; *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 444.

Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U.S. at 288, 120 S. Ct. at 765; *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 3313, 77 L.Ed.2d 987 (1983); *Henderson v. Quarterman*, 460 F.3d at 665; *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 445.

The process of winnowing out weaker arguments on appeal and

focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536, 106 S. Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *Jones v. Barnes*, 463 U.S. at 751-52, 103 S. Ct. at 3313.

Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an *informed* decision that certain avenues will not prove fruitful. *See Busby v. Dretke*, 359 F.3d at 714 (a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not be fruitful); *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004)(holding the same); *Schaetzle v. Cockrell*, 343 F.3d at 445 (failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation). Likewise, solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention. *United States v. Reinhart*, 357 F.3d at 525; *Schaetzle v. Cockrell*, 343 F.3d at 445.

Where, as in petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477 &

482, 120 S. Ct. 1029, 1034 & 1037, 145 L.Ed.2d 985 (2000)(holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U.S. at 287-89, 120 S. Ct. at 765-66 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*); *Busby v. Dretke*, 359 F.3d at 714-17 (applying dual prongs of *Strickland* to a complaint about appellate counsel's failure to present a point of error on appeal).

   b. <u>No Deficient Performance</u>

  Petitioner's trial counsel made no challenge for cause against Esparza and failed to exercise a peremptory challenge against her. Instead, petitioner's trial counsel advised the trial court Esparza was acceptable as a juror.[50]  Thus, as respondent correctly points out, under applicable Texas law (specifically Rule 33.1 of the Texas Rules of Appellate Procedure), petitioner failed to preserve for state appellate review any complaint of alleged disqualifying bias against venire member Esparza. *See Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006)("in order to preserve an issue for appeal, a timely objection must be made that states the specific ground of objection, if the specific ground was not apparent from the context").  Under such circumstances, there was

_____

[50] S.F. Trial, Volume 13, at p. 157.

nothing objectively unreasonable about the decision of petitioner's state appellate counsel not to raise a point of error which, in all reasonable likelihood, would have been summarily dismissed by the state appellate courts. Furthermore, for the reasons discussed at length in Section VII.D.2. above, petitioner's state appellate counsel could reasonably have concluded an appellate point of error accusing Esparza of disqualifying bias possessed little realistic chance of success. Under such circumstances, there was nothing objectively unreasonable in a decision by petitioner's state appellate counsel not to present a point of error arguing Esparza had disqualifying bias. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002)(holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926 (2003); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir. 1998)(nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied*, 526 U.S. 1100 (1999); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997)(failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied*, 525 U.S. 969 (1998).

      c.   No Prejudice

Moreover, because petitioner procedurally defaulted on his bias complaint against Esparza, and for the reasons set forth in

Section VII.D.2.c. above, there is no reasonable probability that, but for the failure of petitioner's state appellate counsel to challenge Esparza as biased on direct appeal, the outcome of petitioner's direct appeal would have been any different. The failure of petitioner's state appellate counsel to raise a procedurally defaulted, meritless point of error on direct appeal did not "prejudice" petitioner within the meaning of *Strickland*. *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999)(holding a complaint about counsel's failure to raise a meritless objection fails to satisfy the prejudice prong of *Strickland* because the failure to make a meritless objection has no impact on the outcome of the proceeding).

> d. <u>Conclusions</u>

Petitioner procedurally defaulted on his complaint of ineffective assistance by his state appellate counsel by failing to fairly present that same claim to the state courts during petitioner's state habeas corpus proceeding. This Court independently concludes petitioner's complaint of ineffective assistance by his state appellate counsel fails to satisfy either prong of *Strickland*. Therefore, this complaint does not warrant federal habeas relief. Petitioner's procedurally defaulted fourth claim for relief herein lacks any arguable merit and, therefore, does not warrant federal habeas relief.

# VIII. **Certificate of Appealability**

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S. Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. §2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000); *Lackey v. Johnson*, 116 F.3d

149, 151 (5th Cir. 1997). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S. Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123 S. Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S. Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S. Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S. Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336, 123 S. Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S. Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S. Ct. at 3394 n.4. This Court is authorized to address the propriety of granting a CoA *sua*

*sponte*. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate that reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S. Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S. Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S. Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S. Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner

shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Foster v. Quarterman*, 466 F.3d at 364; *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir. 2006); *Pippin v. Dretke*, 434 F.3d at 787; *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See, e.g., Scheanette v.* Quarterman, 482 F.3d at 828-29 (holding petitioner *not* entitled to a CoA on *a Ring* claim similar to petitioner's second and third claims herein); *Turner v. Quarterman*, 481 F.3d at 301-02 (holding petitioner eligible for CoA on *neither* ineffective assistance, *Ring*, nor "failure to inform jury of the effect of a hung jury" claims); *Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of innovative challenges to the Texas capital sentencing scheme, including many similar to those raised by petitioner in his sixth through twelfth claims herein).

None of petitioner's claims herein satisfy the standard for obtaining a CoA. The Texas Court of Criminal Appeals' rejection on the merits of petitioner's *Atkins* is unassailable. Petitioner presented the state habeas court with absolutely no evidence from

100

which a rational fact finder could have concluded petitioner satisfied either of the two clinical criteria for a finding of mental retardation referenced in the Supreme Court's *Atkins* opinion. Whatever merit there might be to petitioner's *Atkins* claim, there is no basis for finding unreasonable the Texas Court of Criminal Appeals' rejection of this claim on the merits. There was ample evidence in the state trial record, particularly the testimony of petitioner's former supervisor, from which a reasonable jurist could have concluded petitioner's mental retardation assertion was frivolous.

The Texas Court of Criminal Appeals' rejection on the merits of petitioner's ineffective assistance claims was likewise unquestionably reasonable in view of petitioner's utter failure to present any evidence casting doubt on the objective reasonableness of his trial counsels' strategic decision-making. Petitioner presented the state habeas court with no evidence showing his trial counsel acted in an objectively unreasonable manner. In fact, petitioner presented the state habeas court with uncontradicted testimony from petitioner's former lead trial counsel that established said counsel, together with his investigator and forensic psychologist, were unable to find any evidence whatsoever suggesting petitioner, who communicated very effectively with trial counsel, was mentally retarded or suffered from a mental defect. On the contrary, the state habeas court was informed, without

contradiction, that the court-appointed defense expert concluded petitioner was a cold-blooded, remorseless, anti-social personality.  Petitioner presented the state habeas court with no evidence establishing any additional mitigating evidence would have been disclosed had petitioner's trial counsel undertaken a more extensive investigation into petitioner's intelligence or mental health.  Under such circumstances, there was nothing unreasonable in petitioner's trial counsels' decision not to pursue further or present double-edged psychological mitigation evidence.  Nor was petitioner prejudiced by any failure on the part of his trial counsel to further investigate petitioner's mental health or intelligence.  Petitioner presented the state habeas court with no evidence raising a legitimate question about the objective reasonableness of petitioner's trial counsel's investigation of petitioner's background or said counsels' tactical decisions regarding what type of mitigating evidence they would present during the punishment phase of petitioner's capital murder trial.

Petitioner's complaint with his appellate counsel is likewise devoid of even arguable merit.  The only additional point of error petitioner now argues his appellate counsel should have raised on direct appeal was procedurally defaulted under state procedural rules long before the appointment of petitioner's state appellate counsel.  Furthermore, petitioner's claim of alleged bias on the part of juror Esparza, based solely on Esparza's voir dire

examination, does not satisfy the federal constitutional standard for disqualification of jurors. There was nothing objectively unreasonable in the decision of petitioner's state appellate counsel to forego presenting such a frivolous and procedurally defaulted claim on direct appeal.

In view of the overwhelming evidence of petitioner's guilt contained in petitioner's own written statement and the horrific details of petitioner's capital offense, petitioner's complaints about the admission of hearsay-within-hearsay evidence showing Jessica Garcia once sought the services of the Bexar County Women's Shelter and testimony showing petitioner once advised police that he was affiliated with a street gang do not rise above the level of harmless error. Moreover, admission of this evidence during the punishment phase of petitioner's trial pales in comparison with the evidence already before the jury during the guilt-innocence phase of petitioner's trial. Reasonable jurists could not disagree: admission of this evidence did not render the punishment phase of petitioner's trial fundamentally unfair.

The exact, same legal arguments underlying petitioner's facial attack upon the constitutionality of the Texas capital sentencing scheme have been rejected by the both the Fifth Circuit and this Court on numerous occasions. There is no rational basis for any argument over the continuing efficacy of the Texas capital sentencing scheme in light of the Supreme Court's opinions in *Ring*

and *Apprendi*. Neither of those opinions addressed a capital sentencing scheme, like the one in Texas, which narrowly defines the offense of capital murder through strict statutory criteria and requires the jury to make the "eligibility" determination discussed in *Tuilaepa* beyond a reasonable doubt at the guilt-innocence phase of trial. Texas further narrows the class of persons eligible for the death penalty by requiring the jury to find, beyond a reasonable doubt, there is a probability the defendant will commit future acts of criminal violence posing a threat to society. Thus, unlike the "aggravating factors" discussed in many Supreme Court opinions addressing capital sentencing in "weighing jurisdictions," the mitigation or *Penry* special issue employed in the Texas capital sentencing scheme serves not to render the defendant eligible for the death penalty or to "select" the defendant for execution; rather, it allows the capital sentencing jury unfettered discretion to dispense an act of grace to the otherwise condemned defendant.

None of petitioner's claims present even an arguable basis for federal habeas relief under the AEDPA. There is no room for disagreement among reasonable jurists as to any of the foregoing conclusions. Petitioner is not entitled to a CoA for the purpose of re-arguing claims, such as his *Atkins* claim, which he failed to support with any evidence during his state habeas proceeding. Therefore, petitioner is not entitled to a CoA in this cause.

Accordingly, it is hereby **ORDERED** that:

1.     All    federal    habeas    corpus    relief    requested in
       petitioner's second amended petition herein is **DENIED.**

2.     Petitioner is **DENIED** a Certificate of Appealability on
       all  claims  presented  in  his  second  amended  petition
       herein.

3.     All other pending motions are **DISMISSED** AS MOOT.

4.     The  Clerk  shall  prepare  and  enter  a  Judgment in
       conformity with this Memorandum Opinion and Order.

SIGNED this 14th day of December, 2009.


_____

XAVIER RODRIGUEZ

UNITED STATES DISTRICT JUDGE